**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 4, 2016**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

INDEPENDENCE INSTITUTE,

      Plaintiff-Appellant,

v.

WAYNE W. WILLIAMS, in his
official capacity as the Colorado
Secretary of State,

      Defendant-Appellee.

No. 14-1463

---

COLORADO ETHICS WATCH;
COLORADO COMMON CAUSE;
DEMOCRACY 21; PUBLIC
CITIZEN; and THE CAMPAIGN
LEGAL CENTER,

      Amici Curiae.

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. NO. 1:14-CV-02426-RBJ)**

---

Allen Dickerson (Tyler Martinez, Center for Competitive Politics, and Shayne M.
Madsen and John Stuart Zakhem, Jackson Kelly, PLLC-Denver, with him on the
briefs), Center for Competitive Politics, Alexandria, Virginia, for Appellant.

Glenn E. Roper, Deputy Solicitor General (Cynthia H. Coffman, Attorney
General, Sueanna P. Johnson, Assistant Attorney General, and Frederick R.
Yarger, Assistant Solicitor General, with him on the brief) Office of the Attorney
General, Denver, Colorado, for Appellee.

Margaret G. Perl and Luis A. Toro, Colorado Ethics Watch, and Benjamin J. Larson, Ireland Stapleton Pryor & Pascoe, PC, Denver, Colorado, on the brief for Amici Curiae Colorado Ethics Watch and Colorado Common Cause.

Fred Wertheimer, Democracy 21, J. Gerald Hebert, Tara Malloy, Lawrence M. Noble, and Megan McAllen, The Campaign Legal Center, Donald J. Simon, Sonosky, Chambers, Sachse Enderson & Perry, LLP, and Scott L. Nelson, Public Citizen Litigation Group, Washington, DC, on the brief for Amici Curiae The Campaign Legal Center, Democracy 21 and Public Citizen.

---

Before **TYMKOVICH**, Chief Judge, **MURPHY**, and **BACHARACH**, Circuit Judges.

---

**TYMKOVICH**, Chief Judge.

---

The Independence Institute is a nonprofit corporation, organized and tax-exempt under 26 U.S.C. § 501(c)(3), that conducts research and educates the public on public policy. During the 2014 Colorado gubernatorial campaign, the Institute intended to air an advertisement on Denver-area television that was critical of the state's failure to audit its new health care insurance exchange. The ad culminates with an exhortation to viewers to call the incumbent governor—a candidate in the election—and tell him to support an audit of the exchange.

The Institute is concerned that the ad qualifies as an "electioneering communication" under the Colorado Constitution and, therefore, to run it the Institute would have to disclose the identity of financial donors who funded the ad. The Institute resists the disclosure requirement, arguing that the First

Amendment as interpreted by the Supreme Court in *Buckley v. Valeo*, 424 U.S. 1 (1976), prohibits disclosure of donors to an ad that is purely about a public policy issue and is unrelated to a campaign.

We affirm the district court's grant of summary judgment to the Secretary. Colorado's disclosure requirements, as applied to this advertisement, meet the exacting scrutiny standard articulated by the Supreme Court in *Citizens United v. Federal Election Commission*, 558 U.S. 310 (2010). The provision serves the legitimate interest of informing the public about the financing of ads that mention political candidates in the final weeks of a campaign, and its scope is sufficiently tailored to require disclosure only of funds earmarked for the financing of such ads.

## I. Background

Colorado requires any person who spends at least $1000 per year on "electioneering communications" to disclose the name, address, and occupation of any person who donates $250 or more for such communications.[1] Colo. Const.

---

[1] In full, the provision provides:

> (1) Any person who expends one thousand dollars or more per calendar year on electioneering communications shall submit reports to the secretary of state in accordance with the schedule currently set forth in 1-45-108(2), C.R.S., or any successor section. Such reports shall include spending on such electioneering communications, and the name, and address, of any person that contributes more than two

(continued...)

art. XXVIII, § 6(1). For our purposes, "electioneering communication" is defined as "any communication broadcasted by television or radio" that "unambigously refers to any candidate" "sixty days before a general election" and targets "an audience that includes members of the electorate for such public office." *Id.* § 2(7)(a).[2]

---

[1](...continued)
> hundred and fifty dollars per year to such person described in this section *for an electioneering communication*. In the case where the person is a natural person, such reports shall also include the occupation and employer of such natural person. The last such report shall be filed thirty days after the applicable election.

Colo. Const. art. XXVIII, § 6(1) (emphasis added). The Secretary interprets the requirement to apply only to donations specifically earmarked for electioneering communications. In other words, the donor must intend the donations be used for electioneering communications and not for other activities of the speaker.

[2] The full definition is as follows:

> "Electioneering communication" means *[A]ny communication broadcasted* by television or radio, *printed* in a newspaper or on a billboard, directly mailed or *delivered* by hand to personal residences or *otherwise distributed* that:
>
> (I) *Unambiguously refers to any candidate*; and
>
> (II) Is broadcasted, printed, mailed, delivered, or distributed within thirty days before a primary election or *sixty days* before a *general election*; and
>
> (III) Is broadcasted to, printed in a newspaper distributed to, mailed to, delivered by hand to, or otherwise distributed to an audience that includes members of the

(continued...)

Last year, less than sixty days before Colorado's gubernatorial election, the Institute intended to run a television advertisement urging voters to support an audit of Colorado's Health Benefit Exchange. The ad mentioned Colorado's incumbent governor by name, instructing viewers to "[c]all Governor Hickenlooper and tell him to support legislation to audit the state's health care exchange." App. 14. Governor Hickenlooper was a candidate for re-election at the time.

The full ad goes as follows:

[2](...continued)
electorate for such public office.

Colo. Const. art. XXVIII, § 2(7)(a) (emphases added). Excluded from this definition are:

> (I) Any news articles, editorial endorsements, opinion or commentary writings, or letters to the editor printed in a newspaper, magazine or other periodical not owned or controlled by a candidate or political party;
>
> (II) Any editorial endorsements or opinions aired by a broadcast facility not owned or controlled by a candidate or political party;
>
> (III) Any communication by persons made in the regular course and scope of their business or any communication made by a membership organization solely to members of such organization and their families;
>
> (IV) Any communication that refers to any candidate only as part of the popular name of a bill or statute.

*Id.* § 2(7)(b).

| Audio | Visual |
|---|---|
| Doctors recommend a regular check up to ensure good health. | *Video of doctor and mother with child.* |
| Yet thousands of Coloradoans lost their health insurance due to the new federal law. | *Headlines of lost insurance stories.* |
| Many had to use the state's government-run health exchange to find new insurance. | *Denver Post headline "Colorado health exchange staff propose $13M fee on all with insurance"* |
| Now there's talk of a new $13 million fee on your insurance. | |
| It's time for a check up for Colorado's health care exchange. | |
| Call Governor Hickenlooper and tell him to support legislation to audit the state's health care exchange. | *Call Gov. Hickenlooper at (303) 866-2471.* *Tell him to support an audit of the health care exchange.* |
| INDEPENDENCE INSTITUTE IS RESPONSIBLE FOR THE CONTENT OF THIS ADVERTISING. | *Paid for by The Independence Institute, Jon Caldara, President. 303-279-6536. www.indepedenceinstitute.org* |

*Id.* Recognizing that its proposed ad would qualify as an "electioneering communication" and fearing that compelled disclosure would infringe its members' First Amendment right to free association, the Institute sought a preliminary injunction in federal court against the application of Colorado's disclosure requirements. The parties agreed to convert the motion for preliminary

injunction into a motion for summary judgment. The Secretary then cross-moved for summary judgment. The district court entered judgment for the Secretary, holding the disclosure requirements survived exacting scrutiny and, therefore, did not violate the First Amendment.[3]

## II. Analysis

The Institute argues that applying Colorado's disclosure requirements to this particular ad would be unconstitutional because, in its view, the ad had nothing to do with the governor's reelection campaign. It merely advanced an opinion about a public policy issue and informed viewers that they could take action by calling the governor. This is true as far as it goes, but as we explain, Supreme Court precedent allows limited disclosure requirements for certain types of ads prior to an election even if the ads make no obvious reference to a campaign.

We start with the Supreme Court's seminal campaign finance decision in *Buckley v. Valeo*, 424 U.S. 1 (1976). The Federal Election Campaign Act of 1971 (FECA) placed limits on contributions to political campaigns and expenditures for political communications. Both types of regulations "impinge on protected

---

[3] Although the 2014 gubernatorial election has passed, this appeal is not moot. There is no dispute that the Institute intends to run similar ads in the future. Moreover, it is clear in this case that there was not enough time to fully litigate the issue during the sixty-day window provided by law and that a significant chance exists for the alleged violation to recur. *See Fleming v. Gutierrez*, 785 F.3d 442, 445-46 (10th Cir. 2015).

associational freedoms," *id.* at 22, which "derive[] from the rights of [an] organization's members to advocate their personal points of view in the most effective way," *id.* at 75. Contribution limitations, however, "entail[] only a marginal restriction upon the contributor's ability to engage in free communication." *Id.* at 20. They "are permissible as long as the Government demonstrates that the limits are closely drawn to match a sufficiently important interest." *Randall v. Sorrell*, 548 U.S. 230, 247 (2006) (internal quotation marks omitted).

Expenditure limitations are another and more troublesome matter because they "necessarily reduce[] the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached." *Buckley*, 424 U.S. at 19. Thus, they "represent substantial rather than merely theoretical restraints on the quantity and diversity of political speech." *Id.* Spending limitations often go to core political speech by "preclud[ing] most associations from effectively amplifying the voice of their adherents." *Id.* at 22. For these reasons, they have to satisfy strict scrutiny—a provision must be narrowly tailored to further a compelling governmental interest. *Citizens United*, 558 U.S. at 340.

As to the compelled disclosure of donors who make political contributions or expenditures, *Buckley* concluded that they, like contribution and spending limitations, pose a significant threat to associational freedom. *Buckley*, 424 U.S.

at 64–66. This is because "financial transactions can reveal much about a person's activities, associations, and beliefs." *Id.* at 66 (parentheses omitted). But unlike contribution and spending limitations, disclosure requirements "impose no ceiling on campaign-related activities." *Id.* at 64. Accordingly, as emphasized in *Citizens United v. Federal Election Commission*, to impose disclosure requirements the government must only satisfy "exacting scrutiny, which requires a substantial relation between the disclosure requirement and a sufficiently important governmental interest." 558 U.S. at 366-67 (internal quotation marks omitted). The *Buckley* Court identified important government interests that could meet the burden, including "provid[ing] the electorate with information," "deter[ring] actual corruption and avoid[ing] the appearance of corruption," and "gathering the data necessary to detect violations of" other election laws. *Buckley*, 424 U.S. at 66–68.

In applying these principles to the Institute's advertisement, our analysis under exacting scrutiny is twofold. First, we explain that sufficiently tailored disclosure requirements can reach at least some types of issue speech, including speech that does not reference a particular election campaign but does mention a candidate shortly before an election. We then hold the Colorado disclosure requirements serve important government interests and are sufficiently tailored to justify the compelled disclosure of donors to the ad.

### A. *Disclosure Requirements Can Reach Some Issue Speech, Including Speech that Mentions a Candidate Shortly Before an Election*

The Institute contends that the First Amendment right to free association categorically shields proponents of speech that is "unambiguously not campaign-related" from disclosure. Aplt. Br. at 22. In other words, the Institute agrees that express advocacy in favor of or against candidates can be regulated, and even that some advocacy that is not express, but sufficiently "campaign-related," can also be regulated. But it contends that "genuine issue advocacy," even that which mentions a candidate during campaign season, cannot be subjected to disclosure requirements. It says the ad proposed here was on the genuine-issue side of the line and protected from disclosure by the First Amendment.

The logic of Supreme Court case law does not support the Institute's position as applied to its advertisement. Instead, the cases hold that television advertisements that mention candidates shortly before elections *can be* considered sufficiently related to campaigns to fall under permissible disclosure regimes—regimes whose precise requirements are cabined within the bounds of exacting scrutiny. The question we face is whether the Institute's ad, which does not explicitly reference any campaign or state any facts or opinions about Governor Hickenlooper, can be subject to sufficiently tailored disclosure laws. We hold it can.

In arguing that disclosure requirements cannot reach speech that is "unambiguously not campaign-related," the Institute takes us back to *Buckley*. There, the Supreme Court limited disclosure requirements of FECA to speech that was openly campaign-related. FECA required disclosure of "every person (other than a political committee or candidate) who ma[de] contributions or expenditures aggregating over $100 in a calendar year other than by contribution to a political committee or candidate." *Buckley*, 424 U.S. at 74–75 (alterations and internal quotation marks omitted). Qualifying "expenditures" were those made "for the purpose of influencing the nomination or election of candidates for federal office." *Id.* at 77 (alterations and internal quotation marks omitted). The Court held this language potentially vague because its scope was ambiguous and it provided little notice as to what types of expenditures would be covered. *Id.* The Court was also concerned that the statute was overbroad because it might encompass "groups engaged purely in issue discussion." *Id.* at 79; *see also FEC v. Mass. Citizens for Life, Inc. (MCFL)*, 479 U.S. 238, 248–49 (1986) (describing the *Buckley* Court as attempting "to avoid problems of overbreadth").

To save the statute from unconstitutional vagueness and overbreadth, the Court read it narrowly to "reach only funds used for communications that expressly advocate[d] the election or defeat of a clearly identified candidate." *Buckley*, 424 U.S. at 80. In its famous footnote 52, the Court explained that "express words of advocacy of election or defeat" included those such as "'vote

-11-

for,' 'elect,' 'support,' 'cast your ballot for,' 'Smith for Congress,' 'vote against,' 'defeat,' 'reject.'" *Id.* at 44 n.52.[4]

*Buckley*'s limitation of FECA's disclosure requirements to express advocacy was "directed precisely to that spending that is unambiguously related to the campaign of a particular federal candidate." *Id.* at 80. In the Institute's view, *Buckley* thus drew a constitutional boundary between truly campaign-related speech and "genuine issue advocacy"—speech that does not reference a particular campaign or share an opinion about a candidate—with the former subject to regulation and the latter protected from disclosure.[5]

But disclosure law has not been static and *Buckley* must be interpreted in light of more recent Supreme Court elaboration. Several cases bear on our understanding of the current state of disclosure law. First, in *McConnell v. Federal Election Commission*, the Supreme Court explained that *Buckley*'s line-drawing was "the product of statutory interpretation rather than a constitutional

---

[4] The Supreme Court in *Citizens United* clarified that "express advocacy" or its "functional equivalent" is a communication that "is susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate." 558 U.S. at 324–25 (internal quotation marks omitted).

[5] A "genuine issue ad" has been more precisely described as one that "focus[es] on a legislative issue, take[s] a position on the issue, exhort[s] the public to adopt that position, and urge[s] the public to contact public officials with respect to the matter," without "mention[ing] an election, candidacy, political party, or challenger" or "tak[ing] a position on a candidate's character, qualifications, or fitness for office." *FEC v. Wis. Right to Life, Inc. (WRTL II)*, 551 U.S. 449, 470 (2007).

command" and therefore that express advocacy might not be the outer limit of what permissible regulation can reach. 540 U.S. 93, 191–92 (2003), *overruled on other grounds by Citizens United*, 558 U.S. at 365–66. That was because *Buckley* nowhere held a disclosure "statute that was neither vague nor overbroad would be required to toe the same express advocacy line." *Id.* at 192.

The Court's most recent campaign disclosure case that bears on our understanding of *Buckley* is *Citizens United*. In that case, the Court confirmed that there is no constitutionally mandated distinction between express advocacy and some issue speech in the context of disclosure. As is the case here, the Court considered an as-applied challenge to disclosure requirements—specifically, federal requirements that are substantially similar to Colorado's requirements for purposes of this appeal. By way of background, the Bipartisan Campaign Reform Act of 2002 (BCRA, the successor to FECA) defines "electioneering communication" as "any broadcast, cable, or satellite communication" that "refers to a clearly identified candidate for Federal office," that is made within sixty days before a general election or thirty days before a primary election, and, in non-Presidential elections, that "is targeted to the relevant electorate." 52 U.S.C. § 30104(f)(3)(A)(i). The statute requires persons who spend at least $10,000 in one year on electioneering communications to disclose, among other things, the

names and addresses of individuals who contribute $1000 or more to the pool of funds used for those communications.  *Id.* § 30104(f)(1)–(2).[6]

During the 2008 campaign for the Democratic Party's presidential nomination, Citizens United intended to broadcast advertisements for *Hillary: The Movie*.  The movie was a documentary critical of then-Senator Hillary Clinton, a candidate for the nomination.  The movie was so overtly critical, in fact, that the Court found it was the functional equivalent of express advocacy—there was "no reasonable interpretation of *Hillary* other than as an appeal to vote against

---

[6]  The statute specifies,

> (E) If the disbursements were paid out of a segregated bank account which consists of funds contributed solely by individuals who are United States citizens or nationals or lawfully admitted for permanent residence (as defined in section 1101(a)(20) of Title 8) directly to this account for electioneering communications, the names and addresses of all contributors who contributed an aggregate amount of $1,000 or more to that account during the period beginning on the first day of the preceding calendar year and ending on the disclosure date. Nothing in this subparagraph is to be construed as a prohibition on the use of funds in such a segregated account for a purpose other than electioneering communications.

> (F) If the disbursements were paid out of funds not described in subparagraph (E), the names and addresses of all contributors who contributed an aggregate amount of $1,000 or more to the person making the disbursement during the period beginning on the first day of the preceding calendar year and ending on the disclosure date.

52 U.S.C. § 30104(f)(2).

-14-

Senator Clinton." *Citizens United*, 558 U.S. at 326. But the ads promoting the movie, although the Court found several of them "pejorative," *id.* at 320, did not amount to express advocacy.[7] Rather, they only urged viewers to see the movie through Citizens United's video-on-demand distribution service.[8] Nonetheless, they qualified as electioneering communications under BCRA because they would be broadcasted within thirty days before primary elections. Citizens United objected on First Amendment grounds, contending that the disclosure statute could only constitutionally cover "the functional equivalent of express advocacy" and, thus, could not be applied to commercial advertisements that merely encouraged viewers to watch a political documentary. *Id.* at 368.

The Court rejected Citizens United's argument, first noting *Buckley*'s holding that "[d]isclaimer and disclosure requirements may burden the ability to

---

[7] One of the ads simply stated, "If you thought you knew everything about Hillary Clinton . . . wait 'til you see the movie." Text of Citizens United's Advertisements (Ex. 1 to Amended Verified Complaint), *Citizens United v. FEC*, 558 U.S. 310 (2009) (No. 08–205).

[8] In the Institute's view, the Court held the ads promoting the documentary were themselves the functional equivalent of express advocacy. We see little support for this, as the discussion to which the Institute refers is limited to whether a provision of BCRA prohibiting the use of corporate and union general treasury funds to fund electioneering communications could apply to the movie itself. *See Citizens United*, 558 U.S. at 324–26. The Court's conclusion was that the movie qualified as express advocacy, *id.* at 325, but it nowhere suggested the same about the ads. *See also id.* at 321 (describing Citizens United's position as "(1) § 441b is unconstitutional as applied [only] to *Hillary;* and (2) BCRA's disclaimer and disclosure requirements . . . are unconstitutional as applied to *Hillary and to the three ads for the movie*" (emphasis added)).

-15-

speak, but . . . impose no ceiling on campaign-related activities and do not prevent anyone from speaking." *Id.* at 366 (internal quotation marks omitted) (quoting *Buckley*, 424 U.S. at 64). Disclosure requirements accordingly could reach speech that was less explicit in conveying a message about a campaign. *Id.* at 369. The ads for *Hillary: The Movie* were no exception because "the public has an interest in knowing who is speaking about a candidate shortly before an election." *Id.* That "informational interest alone" was sufficiently important to satisfy the First Amendment because "transparency enables the electorate to make informed decisions and give proper weight to different speakers and messages." *Id.* at 369–70. Moreover, the Court considered BCRA's disclosure requirements less restrictive alternatives "to more comprehensive regulations of speech," such as subjecting speakers to PAC-like requirements.[9] *Id.* at 369. The statute therefore survived exacting scrutiny as applied.[10]

It follows from *Citizens United* that disclosure requirements can, if cabined within the bounds of exacting scrutiny, reach beyond express advocacy to at least

---

[9] The obligations that come with political committee status, including reporting and auditing requirements, *see Buckley*, 424 U.S. at 62–63, tend to be considerably more burdensome than disclosure requirements, *see, e.g.*, *MCFL*, 479 U.S. at 262.

[10] The Supreme Court has also rejected a facial challenge to the same disclosure requirements. *McConnell*, 540 U.S. at 196 (holding BCRA survived exacting scrutiny, given the "important state interests" in "providing the electorate with information, deterring actual corruption and avoiding any appearance thereof, and gathering the data necessary to enforce more substantive electioneering restrictions").

some forms of issue speech. Three other circuits have reached the same conclusion in upholding disclosure requirements. *See Ctr. for Individual Freedom v. Madigan*, 697 F.3d 464, 484 (7th Cir. 2012) ("*Citizens United* made clear that the wooden distinction between express advocacy and issue discussion does not apply in the disclosure context."); *Nat'l Org. for Marriage v. McKee*, 649 F.3d 34, 54–55 (1st Cir. 2011) ("We find it reasonably clear, in light of *Citizens United*, that the distinction between issue discussion and express advocacy has no place in First Amendment review of these sorts of disclosure-oriented laws."); *Human Life of Wash., Inc. v. Brumsickle*, 624 F.3d 990, 1016 (9th Cir. 2010) ("Given the Court's analysis in *Citizens United*, and its holding that the government may impose disclosure requirements on speech, the position that disclosure requirements cannot constitutionally reach issue advocacy is unsupportable.").

Nonetheless, the Institute urges that we craft a distinction between what it calls "campaign-related" issue speech and speech that "is unambiguously *not* campaign-related." Aplt. Br. at 22. The latter would be exempt from disclosure requirements even if the former would not. But the reasoning in *Citizens United* precludes that distinction. The Court did not rest its holding on the ground that the public only has an interest in knowing who *references a campaign* shortly before an election. Rather, the Court upheld the application of the statute because of the public's interest "in knowing who is *speaking about a candidate* shortly

-17-

before an election." *Citizens United*, 558 U.S. at 369 (emphasis added). Thus, in insisting that its ad is not "related to" a campaign, *see* Aplt. Br. at 28, the Institute begs the question. The logic of *Citizens United* is that advertisements that mention a candidate shortly before an election *are* deemed sufficiently campaign-related to implicate the government's interests in disclosure. While this is obviously an expansion of *Buckley's* disclosure regime, the Court in *Citizens United* was nearly unanimous in applying BCRA's disclosure requirements both to Citizens United's express advocacy *and* to ads that did not take a position on a candidacy.

Moreover, the Institute has offered no principled mechanism for distinguishing between campaign-related issue speech and speech that is not campaign-related. It suggests that the latter is "speech that does not, under any reasonable interpretation, speak to the communication's recipients about an ongoing campaign for office." Aplt. Br. at 52. This definition does little more than restate the term, "unambiguously not campaign-related," and leads us back to a categorical distinction between express and at least some issue advocacy that the Court rejected in *Citizens United*. And it gives no indication of what would qualify as "speaking" about an "ongoing campaign." An advertisement purporting *merely* to discuss an issue, while incidentally mentioning a candidate, can nonetheless be construed as "relating to" the candidate's campaign. The advertisement here does not say much about Governor Hickenlooper, but it does

insinuate, at minimum, that he has failed to take action on an issue that the Institute considers important. That could bear on his character or merits as a candidate. *C.f. Buckley*, 424 U.S. at 42 ("Candidates, especially incumbents, are intimately tied to public issues involving legislative proposals and governmental actions. Not only do candidates campaign on the basis of their positions on various public issues, but campaigns themselves generate issues of public interest."). The difficulty of reliably distinguishing between campaign-related speech and non-campaign-related speech is why courts must look only to whether the specific statutory definitions before them are sufficiently tailored to the government's legitimate interests.

As an alternative, the Institute proposes that we limit disclosure laws to speech that identifies a candidate and "promotes," "supports," "attacks," or "opposes" that candidate.[11] But this language would essentially impose an express advocacy requirement, which, as we have explained, the Supreme Court has rejected, for now, in the context of disclosure. *See Citizens United*, 558 U.S. at 369.

Accordingly, the Institute has not shown that its ad is immune from well-tailored disclosure requirements.

---

[11] This mirrors one of four statutory definitions of "federal election activity," *see* 52 U.S.C. § 30101(20)(A)(III), which is subject to extensive contribution regulations, *see McConnell*, 540 U.S. at 161–62.

## B. *Colorado's Disclosure Regime Survives Exacting Scrutiny As Applied to the Institute's Advertisement*

Colorado's disclosure requirements, which are substantially similar to the portions of BCRA upheld in *Citizens United*, are sufficiently tailored to meet exacting scrutiny.

To repeat, "exacting scrutiny . . . requires a substantial relation between the disclosure requirement and a sufficiently important governmental interest." *Id.* at 366-67 (internal quotation marks omitted). Like BCRA, Colorado only demands disclosure for communications that unambiguously refer to a primary-election candidate within thirty days of a primary election or a general-election candidate within sixty days of a general election. *See* Colo. Const. art. XXVIII, § 2(7)(a)(I)–(II). The message also must be targeted to the relevant electorate. *Id.* § 2(7)(a)(III). In addition, only certain means of communication are covered: "any communication broadcasted by television or radio, printed in a newspaper or on a billboard, directly mailed or delivered by hand to personal residences or otherwise distributed . . . ." *Id.* § 2(7)(a). This is only slightly broader, if at all, than the language of BCRA covering "broadcast, cable, or satellite" communications. *See* 52 U.S.C. § 30104(f)(3)(A)(I). At any rate, the difference in breadth is insignificant as applied here because the Institute's ad would have been a television broadcast, much like the ads in *Citizens United*. And it is

important to remember that the Institute need only disclose those donors who have specifically earmarked their contributions for electioneering purposes.[12]

It is also worth noting that the only marked difference between BCRA and Colorado's constitutional provision is that the latter is triggered at lower spending thresholds. *Compare* 52 U.S.C. §§ 30104(f)(1), 30104(f)(2)(E)–(F) (requiring those who annually spend an aggregate of $10,000 or more to disclose donors of $1000 or more), *with* Colo. Const. art. XXVIII, § 6(1) (requiring those who annually spend $1000 or more to disclose donors of $250 or more). It is not surprising, however, that a disclosure threshold for state elections is lower than an otherwise comparable federal threshold. Smaller elections can be influenced by less expensive communications. The Secretary has thus shown that Colorado's spending requirements are sufficiently tailored to the public's informational interests.

---

[12]  As explained above, the Colorado Constitution states that disclosure reports must include the names and addresses of those who contribute $250 or more annually "*for* an electioneering communication." Colo. Const. art. XXVIII, § 6(1) (emphasis added). The Secretary interprets this language to apply only to donations *earmarked* for electioneering communications. Colorado regulations used to state this explicitly, *see* Colo. Code Regs. § 1505-6:11.1 (2014), but no longer do so, *see* Colo. Code Regs. § 1505-6:11.1 (2015). Nonetheless, the Secretary maintains that the language in the Colorado Constitution itself requires express indication that the funds are to be used for a communication that would meet the state's definition of "electioneering communication." Ultimately, any question of the scope of the language will be settled by state or federal challenges in an as-applied context.

In short, the same considerations that justify applying BCRA to ads mentioning a candidate prior to an election justify applying Colorado's disclosure requirements to an ad mentioning a candidate prior to an election. While they undoubtedly chill potential donors to some extent, these requirements are sufficiently drawn to serve the public's informational interests and are less restrictive than other alternatives. *See Citizens United*, 558 U.S. at 369. And the *Buckley* language construing FECA's disclosure requirement as applying only to spending that was "unambiguously related to the campaign of a particular federal candidate," 424 U.S. at 80, is not controlling because the Institute has not shown that Colorado's requirements are vague or overbroad on their face or as applied to the advertisement. The Institute has not argued that they are vague, and, given their close similarity to BCRA, they are not overbroad. In fact, consistent with *Buckley*, they are related to campaigns to the extent that they concern the public's "interest in knowing who is speaking about a candidate shortly before an election." *See Citizens United*, 558 U.S. at 369.

Finally, the Institute attempts to limit *Citizens United* to its bare facts. It argues that whereas the ads for *Hillary: The Movie* were "about" Senator Clinton and promoted a documentary that was highly critical of her, the Institute's ad does not express views about Governor Hickenlooper. Regardless of whether we agree with that description of the facts, it does not affect the outcome of this case. The Court's reasoning in *Citizens United* did not fixate on the peculiarities of

-22-

*Hillary: The Movie*; instead, it held disclosure requirements could extend beyond the functional equivalent of express advocacy and that the public has an interest in knowing who communicates about a candidate shortly before an election. *Id.*[13]

This is not the case where a plaintiff demonstrated that disclosure might lead to retaliation against its members. In those circumstances, *Citizens United* tells us that an as-applied challenge might be available "if a group could show a reasonable probability that disclosure of its contributors' names will subject them to threats, harassment, or reprisals from either Government officials or private parties." 558 U.S. at 367 (internal quotation marks omitted)). *But see id.* at 484 (Thomas, J., dissenting in part) (noting that the availability of as-applied challenges based on the threat of retaliation may not be enough to protect First Amendment rights because "disclosure permits citizens to react to the speech of their political opponents in a proper—or undeniably *improper*—way long before a

---

[13] The Institute argues that this was dicta because the Court had already held that *Hillary: The Movie* was the functional equivalent of express advocacy, *see Citizens United*, 558 U.S. at 325, and, in the Institute's view, the Court had also held the ads promoting the documentary were the functional equivalent of express advocacy. As explained above, we disagree. But in any event, whether the Court's reasoning was dicta does not affect our present analysis because "this court considers itself bound by Supreme Court dicta almost as firmly as by the Court's outright holdings, particularly when the dicta is recent and not enfeebled by later statements." *Gaylor v. United States*, 74 F.3d 214, 217 (10th Cir. 1996). *But see Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1136 (10th Cir. 2015) (Tymkovich, J., dissenting in part) ("Although we are bound by this recent Supreme Court dicta, nothing about it ought to short-circuit our analysis of this [law] as applied to [these circumstances]." (citation omitted)).

plaintiff could prevail on an as-applied challenge" (alterations and internal quotation marks omitted)).

But in this case the Institute does not argue it is subject to such concerns. Thus, we simply hold that *Citizens United* is dispositive as to the constitutionality of Colorado's disclosure laws as applied to the Institute's ad.

## III. Conclusion

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment to the Secretary.