FILED
United States Court of Appeals
Tenth Circuit

March 2, 2016

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

COALITION FOR SECULAR
GOVERNMENT, a Colorado nonprofit
corporation,

      Plaintiff - Appellee,

v.

WAYNE WILLIAMS, in his official
capacity as Colorado Secretary of State,

      Defendant - Appellant.

------------------------

COLORADO ETHICS WATCH;
COLORADO COMMON CAUSE,

      Amici Curiae.

No. 14-1469

_____

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:12-CV-01708-JLK)**
_____

Matthew D. Grove, Assistant Solicitor General (Cynthia H. Coffman, Attorney General, Frederick R. Yarger, Assistant Solicitor General, Sueanna P. Johnson, Assistant Attorney General, with him on the briefs) Office of the Attorney General for the State of Colorado, Denver, Colorado, for Defendant-Appellant.

Allen Dickerson, Center for Competitive Politics, Alexandria, Virginia (Tyler Martinez, Center for Competitive Politics, Alexandria, Virginia, with him on the briefs), for Plaintiff-Appellee.

Benjamin J. Larson, Ireland Stapleton Pryor & Pascoe, Denver, Colorado, for Colorado Common Cause, Amicus Curiae.

Luis A. Toro and Margaret G. Perl, Colorado Ethics Watch, Denver, Colorado, for Colorado Ethics Watch, Amicus Curiae.

_____

Before **PHILLIPS**, **McHUGH**, and **MORITZ**, Circuit Judges.

_____

**PHILLIPS**, Circuit Judge.

_____

Colorado Secretary of State Wayne Williams (Secretary) appeals a district court order enjoining him from enforcing Colorado's issue-committee registration and disclosure requirements against the Coalition for Secular Government (Coalition), a nonprofit corporation that was planning to advocate against a statewide ballot initiative in the 2014 general election. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I.     BACKGROUND

The Coalition is a Colorado nonprofit corporation whose mission is "to educate the public about the necessary secular foundation of a free society, particularly the principles of individual rights and separation of church and state." J.A. vol. 5 at 933. In 2008, Dr. Diana Hsieh, who holds a doctorate degree in philosophy, founded the Coalition and is solely responsible for its operations.

In accordance with its mission, the Coalition publishes a policy paper each year in which a proposed "personhood" amendment appears on Colorado ballots.[1] The policy paper advocates against the personhood amendment, explains the Coalition's view of the deleterious effects of passing such an amendment, and urges "no" votes on the ballot initiative. In 2008, 2010, and 2014, the Coalition used contributed funds to publish its personhood policy paper. Dr. Hsieh and a colleague co-authored each paper and distributed the papers publicly, first by printing and mailing copies and later by making the paper available online.

Under Colorado law, the Coalition's activities triggered various issue-committee registration and disclosure requirements, which we detail below.

## A. Colorado's Issue-Committee Regulatory Framework

The Colorado Constitution defines "issue committee" as follows:

> [A]ny person, other than a natural person, or any group of two or more persons, including natural persons: (I) That has a major purpose of supporting or opposing any ballot issue or ballot question; or[2] (II) That has accepted or made contributions or

---

[1] For instance, in 2010, Colorado citizens voted on "[a]n amendment to the Colorado Constitution applying the term 'person' as used in those provisions of the Colorado Constitution relating to inalienable rights, equality of justice and due process of law, to every human being from the beginning of the biological development of that human being." J.A. vol. 4 at 769.

[2] The Secretary has promulgated a rule defining "issue committee" to mean "a person or a group of people that meets *both* of the conditions in [Colo. Const. art. XXVIII, § 2(10)(a)(I) and 2(10)(a)(II)]." Colo. Code Regs. § 1505-6:1.9 (2015) (emphasis added). In effect, this rule changes the "or" that exists in the Colorado Constitution's definition of issue committee to "and." Notwithstanding the Secretary's interpretation of the Colorado Constitution, and especially in light of *Gessler v. Colo. Common Cause*, 327 P.3d 232, 236–38 (Colo. 2014) (declaring a regulation unlawful because it conflicted with a constitutional provision), we enforce

> expenditures in excess of two hundred dollars to support or oppose any ballot issue or ballot question.

Colo. Const. art. XXVIII, § 2(10)(a).[3] Once a person or group of persons qualifies as an issue committee under this definition, a substantial set of registration and disclosure requirements apply.

Initially, we note that the regulatory framework governing issue committees in Colorado derives from multiple sources: the state's constitution, Colo. Const. art. XXVIII, §§ 2–3, 7, 9–10; its statutes, Colo. Rev. Stat. §§ 1-45-101 to -118 (2015); and its regulations, Colo. Code Regs. § 1505-6 (2015). As we evaluate the claims now raised, we take care to note the source of each relevant registration or disclosure requirement. Knowing where any unconstitutional burdens lie is the key to Colorado's addressing them.

---

the "or" in the issue-committee definition just as it is written in the Colorado Constitution. Thus, we disagree with amici curiae Colorado Ethics Watch and Colorado Common Cause, who argue that Article XXVIII "explicitly" defines "issue committee" as a group (or group of persons) that spends or receives $200 *and* has as its major purpose supporting or opposing a ballot initiative. *See* Amici Curiae Brief at 8.

On appeal, the Coalition does not challenge its putative status as an issue committee or the Secretary's interpretation of the Colorado Constitution. Therefore, we assume for this case that the Coalition—in its activities opposing the personhood-amendment ballot initiative—is indeed an issue committee under the Colorado Constitution.

[3] Article XXVIII of the Colorado Constitution "was proposed by citizen's initiative as Amendment 27 and adopted by popular vote in 2002." *Colo. Ethics Watch v. Senate Majority Fund, LLC*, 269 P.3d 1248, 1253 (Colo. 2012).

## 1. *Constitutional Requirements*

Although Article XXVIII of the Colorado Constitution defines "issue committee," it imposes few registration or disclosure requirements, leaving it to the legislative and executive branches to fill in the details. Even so, we still see six constitutional provisions that bear on our case.

First, section 3(9) requires that issue committees deposit all contributions in "a financial institution in a separate account whose title shall include the name of the committee . . . ." Colo. Const. art. XXVIII, § 3(9). This subsection also imposes some recordkeeping responsibilities: "All records pertaining to such accounts shall be maintained by the committee . . . for one-hundred eighty days following any general election in which the committee . . . received contributions unless a complaint is filed, in which case they shall be maintained until final disposition of the complaint and any consequent litigation." *Id.*

Second, section 3(10) forbids issue committees from "accept[ing] a contribution, or mak[ing] an expenditure, in currency or coin exceeding one hundred dollars." *Id.* § 3(10).

Third, section 3(11) provides that "[n]o person shall be reimbursed for a contribution made to any . . . issue committee, . . . nor shall any person make such reimbursement . . . ." *Id.* § 3(11).

Fourth, section 9(2)(a) permits any person to file a complaint against anyone violating the issue-committee regulatory framework. Any such person "may file a written complaint with the secretary of state no later than one hundred eighty days

5

after the date of the alleged violation." *Id.* § 9(2)(a). In response to any filed complaint, the Colorado Constitution requires the Secretary to "refer the complaint to an administrative law judge [(ALJ)] within three days . . . ." *Id.* The ALJ then must "hold a hearing within fifteen days of the referral of the complaint" and "render a decision within fifteen days of the hearing." *Id.* The Colorado Court of Appeals may review the ALJ's final decision, and if the Secretary fails to enforce the ALJ's decision within 30 days, the complainant may bring a private action in Colorado district court. *Id.*

Fifth, section 10(2)(a) provides that an "appropriate officer" must impose a $50 penalty "per day for each day" that any violation of the issue-committee disclosure requirements in Colo. Const. art. XXVIII, § 7, or Colo. Rev. Stat. § 1-45-108, remains uncured. Colo. Const. art. XXVIII, § 10(2)(a).

Sixth and finally, section 7 provides that "[t]he disclosure requirements of section 1-45-108, C.R.S., or any successor section, shall be extended to require disclosure of the occupation and employer of each person who has made a contribution of one hundred dollars or more to a[n] . . . issue committee . . . ." *Id.* § 7. For issue committees, then, the Colorado Constitution itself simply requires the state legislature to extend one existing statute to include one limited disclosure.

### 2. *Statutory Requirements*

Colorado statutes—specifically, Colorado's Fair Campaign Practices Act, Colo. Rev. Stat. §§ 1-45-101 to -118 (2015)—contain the majority of the issue-committee registration and disclosure requirements.

6

First, under the Act, a person or group of persons must register as an issue committee with the "appropriate officer" within ten days of accepting contributions or making expenditures in excess of $200 to support or oppose a ballot issue. Colo. Rev. Stat. § 1-45-108(3.3). Registration requires a statement listing certain categories of information: the committee's full name; "[a] natural person authorized to act as a registered agent"; "[a] street address and telephone number for the principal place of operations"; "[a]ll affiliated candidates and committees"; and "[t]he purpose or nature of interest of the committee or party." *Id.* § 1-45-108(3)(a)–(e), (3.3).

Once registered, an issue committee must "report to the appropriate officer [its] contributions received, including the name and address of each person who has contributed twenty dollars or more; expenditures made, and obligations entered into by the committee . . . ." *Id.* § 1-45-108(1)(a)(I). In accordance with the Colorado Constitution's mandate, the Act also requires that an issue committee's disclosure reports "include the occupation and employer of each person who has made a contribution of one hundred dollars or more to such committee . . . ." *Id.* § 1-45-108(1)(a)(II); *see* Colo. Const. art. XXVIII, § 7.

The Act also requires an issue committee to

> file a report with the secretary of state of any contribution of one thousand dollars or more at any time within thirty days preceding the date of the primary election or general election. This report shall be filed with the secretary of state no later than twenty-four hours after receipt of said contribution.

Colo. Rev. Stat. § 1-45-108(2.5).

7

Under section 1-45-108(2), every issue committee must file disclosure reports that include the information identified above. Subsection (2) requires multiple filings during election years and less frequent filings during off-election years. *See id.* § 1-45-108(2)(a). In 2014, for example, an issue committee that supported or opposed a ballot initiative in Colorado's general election would have had to file disclosure reports on May 5, May 19, June 2, June 16, July 1, August 1, September 2, September 15, September 29, October 14, October 27, and December 4. In addition, issue committees would have had to file reports within 24 hours of receiving any contribution of $1,000 or more. *See id.* § 1-45-108(2.5). If a 2014 issue committee's registered agent did not file a report terminating the issue committee, the issue committee would have had to continue filing quarterly reports even in off-election years. *Id.* § 1-45-108(2)(a)(I)(A).

Finally, the Act provides additional reporting requirements for certain media-related activity:

> An issue committee making an expenditure in excess of one thousand dollars on a communication that supports or opposes a statewide ballot issue or ballot question and that is broadcast by television or radio, printed in a newspaper or on a billboard, directly mailed or delivered by hand to personal residences, or otherwise distributed shall disclose, in the communication produced by the expenditure, the name of the issue committee making the expenditure.

*Id.* § 1-45-108.3(1).

### 3.    *Regulatory Requirements*

At the legislature's direction, the Secretary has adopted several campaign-finance rules, many of which clarify or supplement constitutional or statutory requirements. For example, one rule clarifies that "[i]f a contributor gives $20 or more in the aggregate during the reporting period, the committee must individually list the contributor on the report, regardless of the amount of each contribution." Colo. Code Regs. § 1505-6:10.2.1. Another rule ensures each issue committee's filed registration statement is up-to-date by requiring the issue committee to "report any change to its committee registration statement to the appropriate filing officer within ten days." *Id.* § 1505-6:12.1. Yet another rule requires issue committees to report any expenditure of $20 or more to the same payee within a single reporting period, including the payee's name and address. *Id.* § 1505-6:10.3.

Neither the Colorado Constitution nor the Act provides for issue-committee termination. But the Secretary's rules do. An issue committee can file a termination report if (1) "[t]he committee no longer has a major purpose of supporting or opposing a ballot measure and no longer intends to accept or make contributions or expenditures" and (2) the committee's reporting account "reflects no cash on hand and no outstanding debts, obligations, or penalties." *Id.* § 1505-6:4.4.

Thus, the Colorado Constitution, the Act, and the Secretary together regulate issue-committee activity.

9

**B.     The Coalition's Activities**

Since 2008, the Coalition has either registered or considered registering as an issue committee in four general elections: 2008, 2010, 2012, and 2014.[4] As a result, the Coalition has previously disclosed certain information about its contributors and expenditures. We detail the Coalition's experience as an issue committee below.

*1.     2008 Election*

In 2008, after publicly announcing her intention to publish the first policy paper opposing Colorado's proposed personhood amendment, Dr. Hsieh registered the Coalition as an issue committee with the Secretary's office on the advice of a friend who was familiar with Colorado's issue-committee laws. In attempting to register the Coalition as an issue committee, Dr. Hsieh accessed the Secretary's website but found it "completely impossible to figure out what . . . to do." J.A. vol. 3 at 597. Eventually, though, Dr. Hsieh concluded that the Coalition would probably spend at least $200 printing and mailing copies of the 2008 policy paper, thus requiring her to register the Coalition as an issue committee under Colorado law.

Accordingly, in 2008, Dr. Hsieh completed a form registering the Coalition as an issue committee opposing the proposed personhood amendment. Dr. Hsieh also completed and filed bi-weekly reports with the Secretary's office detailing any contributions received and expenditures made, each report taking about an hour to complete. In meeting the reporting requirements, Dr. Hsieh found it "difficult" to

---

[4] Again, the Coalition does not challenge its status as an issue committee under the Colorado Constitution, Colorado statutes, or the Secretary's rules.

10

track down the required business addresses where she had purchased items such as mailing envelopes, labels, and postage stamps. *Id.* at 600. Even when the Coalition did not spend any funds or receive contributions during a reporting period, Dr. Hsieh needed to spend about ten minutes filling out nearly blank reports.

In November 2008, after the election, Dr. Hsieh terminated the Coalition's issue-committee status, meaning the Coalition would no longer need to comply with Colorado's disclosure requirements.

### 2. 2010 Election

In 2010, in response to another personhood ballot initiative, Dr. Hsieh solicited financial contributions to enable her and her co-author to update and expand the personhood policy paper. Using what Dr. Hsieh called a pledge model, she publicized that she and her co-author would publish an updated policy paper if they received a total of at least $2,000 in contributions. Putative contributors could then register their names, e-mail addresses, and pledge amounts with the Coalition. Dr. Hsieh told the putative contributors that she would not collect their pledged money if the Coalition did not receive at least $2,000 in pledges. Later in 2010, the Coalition raised and collected about $2,800 in pledges, so the Coalition completed and published its updated policy paper.

Remembering her 2008 experience, Dr. Hsieh again accessed the Secretary's website and registered the Coalition as an issue committee. In registering the Coalition again, Dr. Hsieh learned that Colorado law required issue committees to have separate, standalone bank accounts. In 2008, she had failed to realize (and

11

comply) with this requirement, but now aware of the requirement in 2010, she opened a new bank account "solely to comply with the State's campaign finance requirements." J.A. vol. 3 at 608. After registering the Coalition, Dr. Hsieh once again began filing disclosure reports.

In meeting the reporting requirements, Dr. Hsieh had to list the addresses of all $20-plus contributors. For $100-plus contributors, Dr. Hsieh also had to list their occupations and employer information. She felt it "intrusive" to request that personal information from the Coalition's contributors. *Id.* at 609. In fact, after Dr. Hsieh wrote a blog post describing the reporting requirements, putative contributors reacted, at least one increasing his pledge because he was "angry about the reporting requirements" and five reducing their contributions to avoid the reporting requirements. *Id.* at 631.

By 2010, the Secretary had found ways to ease the reporting burden by implementing its online-reporting system, TRACER. Using TRACER, Dr. Hsieh was better able to transfer disclosure information from her software to the Secretary's website. But even with this improvement, Dr. Hsieh still needed to maintain a spreadsheet, separate from her financial records that she maintained on accounting software, to organize her data so it would sync with the TRACER system. Dr. Hsieh spent about an hour or two completing each TRACER report.

In 2010, Dr. Hsieh failed to file her first disclosure report on time because her house had flooded. Soon afterward, she received an e-mail from the Secretary's office notifying her of the missed deadline and telling her that the Coalition's issue

12

committee could be fined $50 per day for uncured violations of the issue-committee disclosure laws. To stop the fine from increasing, Dr. Hsieh immediately filed an incomplete report that she would later update. Even so, she soon received a notice that the Secretary had assessed the Coalition's issue committee a $50 fine. In response, Dr. Hsieh filed a waiver request, which the Secretary's office granted two weeks later.

Despite the difficulties recounted above, Dr. Hsieh found her 2010 experience with Colorado's issue-committee regulatory framework "significantly easier" than her experience in 2008 because of improved documentation and online resources that streamlined disclosure. *Id.* at 607. In April 2011, after the election, Dr. Hsieh filed the necessary papers to terminate the Coalition's issue-committee status.

### 3.    *2012 Activities*

As the 2012 election neared, the Coalition filed in federal district court a declaratory-judgment suit against Scott Gessler, the then-Colorado Secretary of State. Among other relief, the Coalition requested the court to declare that the Coalition's "expected activity of $3,500 does not require registration as an issue committee." J.A. vol. 1 at 25. On August 13, 2012, the Coalition moved the court for a preliminary injunction. On October 2, 2012, after full briefing on the motion, the federal court certified four questions to the Colorado Supreme Court, including this one: "In light of *Sampson v. Buescher*, 625 F.3d 1247 (10th Cir. 2010), what is the monetary trigger for Issue Committee status under Art. XXVIII § 2(10)(a)(II) of the Colorado Constitution?" J.A. vol. 2 at 428.

On July 2, 2014, the Colorado Supreme Court declined to answer the certified questions "in light of the [Colorado Supreme] Court's decision in 12SC783, *Gessler v. Colorado Common Cause*, which was issued June 16, 2014." *Id.* at 439 (emphasis altered). By then, the 2012 election had come and gone. Because the personhood amendment failed to qualify for the general-election ballot, the Coalition had neither registered as an issue committee nor published an updated policy paper.

### 4.    *2014 Election*

After the Colorado Supreme Court's decision in *Gessler v. Colorado Common Cause*, 327 P.3d 232 (Colo. 2014), the Coalition renewed its preliminary-injunction motion in federal district court. By then, the personhood amendment had qualified for the 2014 general-election ballot, and Dr. Hsieh and her co-author again wanted to update and expand the policy paper urging readers to vote "no" on the latest iteration of the personhood ballot initiative.

The district court consolidated the hearing on the preliminary-injunction motion with a hearing on the merits of the case. As Dr. Hsieh testified at the hearing, the Coalition planned to raise about $1,500 in 2014 to fund the policy paper but still opposed registering as an issue committee. By October 3, 2014, the day of the preliminary-injunction hearing, the Coalition had already received pledges totaling about $2,000.

On October 10, 2014, the district court "ORDERED and DECLARED that [the Coalition]'s expected activity of $3,500 does not require registration or disclosure as an 'issue committee' and the Secretary is ENJOINED from enforcing" Colorado's

14

disclosure requirements against the Coalition.[5] J.A. vol. 2 at 579. Specifically, the district court concluded that the Coalition had "established clearly and convincingly that it will suffer irreparable injury to its First Amendment right of free association." *Id.*

The Secretary appeals the district court's order granting the Coalition declaratory and injunctive relief.

## II.    DISCUSSION

The Secretary presents two issues on appeal. First, does Colorado's $200 threshold for issue-committee registration and reporting violate the First Amendment? And second, can Colorado require issue-committee registration and disclosure for a group that raises and spends $3,500 to influence an election on a statewide ballot initiative? Thus, the Secretary's first issue asks us whether the Colorado Constitution's monetary threshold for defining "issue committee" is facially valid under the First Amendment. The Secretary's second issue asks us whether Colorado's issue-committee regulatory framework is constitutional as applied to the Coalition. We conclude that Colorado's issue-committee regulatory framework is unconstitutional as applied to the Coalition. We therefore do not address the facial validity of the $200 threshold.

---

[5] For the 2012 and 2014 general elections, Dr. Hsieh expected to raise between $1,500 and $3,500 in contributions. The parties agree that the amount involved in this appeal is $3,500.

## A.    Legal Standard

We review de novo the district court's "findings of constitutional fact . . . and conclusions of law." *Faustin v. City & Cty. of Denver*, 423 F.3d 1192, 1195–96 (10th Cir. 2005). "Because this decision implicates First Amendment freedoms, we perform an independent examination of the whole record in order to ensure that the judgment protects the rights of free expression." *Id.* at 1196.

The parties dispute what legal standard governs our review of the constitutional question. The Secretary advocates for exacting scrutiny, which this court has applied in a similar, controlling case. *See Sampson v. Buescher*, 625 F.3d 1247, 1255 (10th Cir. 2010) (discussing the exacting-scrutiny standard). Citing *Buckley v. Valeo*, 424 U.S. 1 (1976), however, the Secretary argues that we should apply a "wholly without rationality" standard in determining whether Colorado's $200 disclosure threshold may stand. *Buckley*, 424 U.S. at 83. To support his view, the Secretary argues that the *Sampson* court applied exacting scrutiny only because "the focus of those plaintiffs was on the impact of the entire disclosure scheme." Appellant's Opening Br. at 31. The Secretary argues that the Coalition's case merits a less-stringent standard since it focuses "specifically on the constitutionality of Colorado's disclosure threshold [of $200]." *Id.* We conclude that exacting scrutiny is the standard that controls this case, at least in deciding the as-applied challenge.

The plaintiffs in *Sampson* sought a declaration that Colorado's "registration and disclosure requirements are unconstitutional, facially, and as applied." *Sampson*, 625 F.3d at 1253. We concluded that, as applied, Colorado's issue-committee

16

regulatory framework failed exacting scrutiny. *Id.* at 1261. Thus, *Sampson* forecloses the Secretary's argument for a less-stringent standard.

We face the exact as-applied question the *Sampson* court faced, though with a putative issue committee that has, at times, raised slightly more money than did the issue committee in *Sampson*. Thus, as in *Sampson*, we will apply exacting scrutiny to the as-applied challenge. *See Doe v. Reed*, 561 U.S. 186, 196 (2010) ("We have a series of precedents considering First Amendment challenges to disclosure requirements in the electoral context. These precedents have reviewed such challenges under what has been termed 'exacting scrutiny.'" (citing, among other cases, *Buckley*, 424 U.S. at 64)).

Exacting scrutiny "requires a 'substantial relation' between the disclosure requirement and a 'sufficiently important' governmental interest." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 366–67 (2010) (quoting *Buckley*, 424 U.S. at 64, 66). "To withstand this scrutiny, 'the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights.'" *Reed*, 561 U.S. at 196 (quoting *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 744 (2008)).

**B.      Whether the Coalition Must Register and Disclose**

We conclude that the Secretary may not constitutionally require the Coalition to register and disclose as an issue committee under Colorado's regulatory framework. The informational interest in the Coalition's disclosures is far outweighed by the substantial and serious burdens of the required disclosures.

17

In assessing the Secretary's arguments, we often draw comparisons to the facts in *Sampson*. We therefore begin by reviewing *Sampson* before proceeding to our exacting-scrutiny analysis of the facts in this case.

### 1.     Sampson *Revisited*

In *Sampson*, we concluded that Colorado's issue-committee regulatory framework was unconstitutional as applied to a group of residents opposing annexation of their unincorporated neighborhood (Parker North) into a larger, incorporated town (Parker). *See Sampson*, 625 F.3d at 1249, 1254. After a Parker North resident submitted a petition to the Parker Town Council seeking annexation of Parker North into Parker, a group of residents joined in opposing the petition and annexation. *Id.* at 1251. To convince other Parker North residents to oppose the petition, the anti-annexation residents "purchased and distributed No Annexation signs, mailed to all residents of Parker North a postcard summarizing the reasons to oppose annexation, continued to discuss and debate the issue on the Internet, and . . . submitted to the [Parker] Town Council a document opposing annexation . . . ." *Id.*

A pro-annexation resident, who had earlier formed an issue committee to support annexation, filed a complaint with the Colorado Secretary of State (then Bernie Buescher) alleging that the anti-annexation residents had violated the Act by failing (1) to register as an issue committee, (2) to comply with issue-committee reporting requirements, and (3) to establish a separate bank account. *Id.* By that time, the anti-annexation residents had received $782.02 in nonmonetary contributions. *Id.* at 1252. All told, the neighborhood group would ultimately receive a total of

18

$2,239.55 in monetary and nonmonetary contributions and spend $1,992.37 opposing the annexation measure and answering the complaint. *See id.* at 1260 n.5.

After retaining an attorney and responding to the complaint, the anti-annexation residents filed suit against Secretary Buescher in federal court alleging that the Colorado issue-committee requirements violated their First Amendment rights to free speech and association. *Id.* at 1253. The federal district court upheld the constitutionality of Colorado's issue-committee regulatory framework as applied to the anti-annexation residents, but we reversed. *Id.* at 1253–54.

In applying exacting scrutiny in *Sampson*, we discussed the public's interest in issue-committee disclosures and the Supreme Court's recognizing "three proper justifications for reporting and disclosing campaign finances." *Id.* at 1256. We concluded that the first two of these justifications—"facilitating the detection of violations of contribution limitations" and deterring quid pro quo corruption—were irrelevant or inapplicable to issue committees. *Id.* This left the third—the public's informational interest. *Id.* Issue-committee disclosures serve the public's informational interest by allowing voters to "identify those who (presumably) have a financial interest in the outcome of the election." *Id.* at 1259. In measuring the value of this informational interest in the annexation debate, we focused on a balance: "[W]hile assuming that there is a legitimate public interest in financial disclosure from campaign organizations, we also recognize that this interest is significantly attenuated when the organization is concerned with only a single ballot issue and when the contributions and expenditures are slight." *Id.*

19

In balancing the public's legitimate interest in financial disclosure with the anti-annexation residents' First Amendment right of association, we concluded that the burden "imposed by Colorado's registration and reporting requirements cannot be justified by a public interest in disclosure." *Id.* In *Sampson*, we characterized Colorado's laws burdening issue committees as "substantial." *Id.* We noted first that "[t]he average citizen cannot be expected to master on his or her own the many campaign financial-disclosure requirements set forth" in the Colorado Constitution, the Act, and the Secretary's rules. *Id.* Second, we noted that hiring an attorney to help comply with disclosure laws and to answer any complaints would often cost more than the total amount of contributions of small-scale issue committees. *Id.* at 1260 (citing *Citizens United*, 558 U.S. at 324 ("The First Amendment does not permit laws that force speakers to retain a campaign finance attorney, conduct demographic marketing research, or seek declaratory rulings before discussing the most salient political issues of our day.")). Finally, we noted the residents' burden of the "time, energy, and money to review the law themselves." *Id.* We concluded that "the financial burden of state regulation on [the anti-annexation residents'] freedom of association approaches or exceeds the value of their financial contributions to their political effort; and the governmental interest in imposing those regulations is minimal, if not nonexistent, in light of the small size of the contributions." *Id.* at 1261.

Having reviewed *Sampson*'s exacting-scrutiny analysis, we turn now to the facts of this case.

## 2. *Framework As Applied to the Coalition*

In our view, *Sampson*'s holding compels us to conclude that Colorado's issue-committee regulatory framework fails exacting scrutiny in this case. Simply put, Colorado's issue-committee regulatory framework remains too burdensome for small-scale issue committees like the Coalition. We commend the Secretary for his progress in streamlining issue-committee disclosures and explaining complex laws to ordinary citizens. But the burdens remain too great in the face of the public's legitimate but minimal interest in information about the Coalition's contributors and expenditures.

### a. *Governmental Interest*

We begin our exacting-scrutiny analysis by noting that under *Sampson*'s reasoning we must conclude that the governmental interest in issue-committee disclosures remains minimal where an issue committee raises or spends $3,500. In *Sampson*, we held that the informational interest was minimal in the financial disclosures of an issue committee that raised and spent about $2,000. *Id.* at 1260. Again, as in *Sampson*, "[t]he case before us is quite unlike ones involving the expenditure of tens of millions of dollars on ballot issues presenting 'complex policy proposals.'" *Id.* at 1261 (quoting *Cal. Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1105 (9th Cir. 2003)).

The Secretary argues that the informational interest in the Coalition's disclosures is "substantial." Appellant's Opening Br. at 32. Citing other courts' discussions of *Sampson*, the Secretary argues that "courts are virtually unanimous in

21

concluding that campaign disclosures are often more meaningful in the ballot initiative context than they are for candidate elections." *Id.* at 34 (citing, among others, *Worley v. Fla. Sec'y of State*, 717 F.3d 1238, 1248 (11th Cir. 2013) ("In the same way the Supreme Court in *Citizens United* rejected the idea that the messenger distorts the message, we reject the notion that knowing who the messenger is distorts the message." (citation omitted))). In *Sampson* we explicitly "assume[d] that there is a legitimate public interest in financial disclosure from" issue committees. 625 F.3d at 1259. Instead of assigning that interest the same weight across all issue committees, however, we recognized that the strength of the informational interest in financial disclosure varies depending on whether an issue committee has raised and spent $10 million, for example, or instead $3,500. In other words, the strength of the public's interest in issue-committee disclosure depends, in part, on how much money the issue committee has raised or spent. We continue to agree with the Ninth Circuit's characterization of this sliding scale:

> As a matter of common sense, the value of this *financial* information to the voters declines drastically as the value of the expenditure or contribution sinks to a negligible level. As the monetary value of an expenditure in support of a ballot issue approaches zero, financial sponsorship fades into support and then into mere sympathy.

*Canyon Ferry Rd. Baptist Church of E. Helena, Inc. v. Unsworth*, 556 F.3d 1021, 1033 (9th Cir. 2009) (emphasis in original); *Sampson*, 625 F.3d at 1260–61 (same).

We reiterate that there is an informational interest in the Coalition's financial disclosures. After all, the Colorado electorate said so in passing Article XXVIII. But

22

at a $3,500 contribution level, we cannot under *Sampson*'s reasoning characterize the disclosure interest as substantial.

### b.    Burden

Obviously, informational interest is just one side of the exacting-scrutiny balance. An issue committee raising or spending a meager $200 might still be required to disclose limited information without violating the First Amendment, but any reporting burdens must be measured against the government's interest in that disclosure. *See Reed*, 561 U.S. at 196 ("To withstand [exacting] scrutiny, 'the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights.'" (quoting *Davis*, 554 U.S. at 744)).

As a practical matter, the burdens here are less substantial than the burdens in *Sampson*. Today, the Secretary's office and website have additional resources to assist people like Dr. Hsieh. In addition, the Secretary's office has implemented the TRACER system, by which issue committees can more easily disclose contributions and expenditures. Dr. Hsieh's easier experience meeting Colorado's issue-committee registration and disclosure requirements is a testament to the Secretary's good work in improving the process. In 2008, issue committees seeking guidance were left to sort through the language of the Colorado Constitution, the Act, and the Secretary's regulations. Yet, apart from the easier entry of information, Colorado's issue-committee regulatory framework and its associated burdens remain fully in place.

In registering the Coalition as an issue committee and complying with Colorado's reporting requirements, Dr. Hsieh still faces an overly burdensome

23

regulatory framework. Although the Secretary has created additional resources to assist issue committees in understanding and complying with registration and disclosure laws, meeting the requirements is no small chore. Implementing TRACER alleviated some technical burdens, but even with TRACER, a person registering an issue committee still faces over 35 online training modules on how to use TRACER. And although TRACER enables Dr. Hsieh to more easily transfer the Coalition's financial information to the Secretary's disclosures database, she still must provide detailed information about the Coalition's most mundane, obvious, and unimportant expenditures (e.g., the address of the post office at which she purchased stamps).

We also note that financial disclosure imposes a unique burden on small-scale issue committees. In 2010, after reaching out to putative contributors who pledged funds in support of the Coalition's policy paper, some putative contributors altered their behavior in response to Dr. Hsieh's request for their personal information. While one contributor increased his contribution in response to the disclosure requirements, the Coalition lost contributions it otherwise would have received. We would expect some prospective contributors to balk at producing their addresses or employment information. And with small-scale issue committees, like the Coalition's, lost contributions might affect their ability to advocate. Although larger-dollar issue committees may not notice some lost donations, Dr. Hsieh vividly recalled losing even $20 contributions.

The Secretary argues that the Coalition's incremental burden in complying with Colorado's issue-committee regulatory framework is less than the overwhelming

burden borne by the anti-annexation residents in *Sampson*. Specifically, the Secretary argues that because the Coalition is a nonprofit corporation instead of a citizen group, the Coalition is better prepared to comply with Colorado's issue-committee laws. Although it is true that the Coalition may closely track finances and use software that helps in creating TRACER reports, we note that Dr. Hsieh operates the Coalition by herself. Dr. Hsieh spends a considerable amount of time tending to the Coalition's disclosure obligations. In this way, Dr. Hsieh experienced the same substantial burdens as did the citizen group in *Sampson*.

In sum, Colorado law imposes a wide range of burdens on issue committees, some of which are slight and others more substantial.

### c. Balancing

In balancing the informational interest in the Coalition's disclosures and the burdens Colorado law imposes, we see a mismatch. In Colorado, at least in the Coalition's circumstances, the minimal informational interest cannot justify the associated substantial burdens.

The minimal informational interest here cannot support Colorado's filing schedule that requires twelve disclosures in seven months regardless of whether an issue committee has received or spent any money. Further, the burden of asking for personal information of $20-contributors is substantial. Gaining the necessary information from these contributors might well result in fewer contributors willing to support an issue committee's advocacy. A $20 threshold for contributor disclosure—

coupled with other registration and reporting requirements—is too burdensome when applied to a small-scale issue committee like the Coalition.

In short, Colorado law—as it stands—demands too much of the Coalition given the public's modest informational interest in the Coalition's disclosures.[6] Voters certainly have an interest in knowing who finances support or opposition to a given ballot initiative, but for small-scale issue committees like the Coalition, Colorado's onerous reporting requirements outweigh that informational interest. At the same time, we recognize that Colorado's current issue-committee regulatory framework is much more justifiable for large-scale, bigger-money issue committees.

In concluding that Colorado's issue-committee regulatory framework is unconstitutional as applied to the Coalition, we decline to address the facial validity of the Colorado Constitution's $200 threshold for issue-committee reporting. The Secretary argues that if we conclude that Colorado may not require the Coalition to register and disclose as an issue committee, we "should [also] facially invalidate the $200 threshold." Appellant's Opening Br. at 68. The Secretary argues that facially invalidating the $200 threshold would "offer certainty to political speakers and regulators in Colorado by permitting the Colorado General Assembly to exercise its

---

[6] Our exacting-scrutiny analysis does not change after this court's recent decision in *Independence Institute v. Williams*, ___ F.3d ____, No. 14-1463, 2016 WL 423759 (10th Cir. Feb. 4, 2016). In *Independence Institute*, we concluded that Colorado's electioneering-communications disclosure framework was constitutional as applied to a television advertisement urging Colorado voters to support an audit of Colorado's Health Benefit Exchange. *Id.* at *1. Because *Independence Institute* involved a different disclosure framework, *Independence Institute*'s as-applied ruling does not impact our decision here.

political judgment to set constitutionally acceptable reporting requirements." *Id.* at 69.

We understand the Secretary's frustration with the present state of the law. Secretary Gessler tried to adjust his office's rules after *Sampson* but then lost his bid to do so in *Gessler*. We sympathize with the Secretary's suggestion that striking the $200 threshold as facially unconstitutional is better than leaving the threshold subject to piecemeal litigation on what amount of contributions and expenditures would be constitutional as applied.[7] For instance, in *Sampson* we declared Colorado's regulatory scheme unconstitutional for an issue committee that raised $2,239.55. Here we do so again for $3,500. So what about $5,000? $10,000?

From no one's perspective is this a satisfactory posture. But the Secretary is better served seeking help from the institution best equipped in our governmental system to solve the problem—the Colorado legislature. As noted, statutes provide most of the onerous reporting requirements. Even the Colorado Constitution's setting a floor of $200 does not require the same full reporting as for larger-scale issue committees. Accordingly, we decline to address the facial validity of the $200 threshold, and leave it to the people of Colorado themselves.

---

[7] At oral argument, the court asked the Secretary's counsel: "It sounds to me like what you're really saying is if we don't win on our first argument [as-applied constitutionality], then find the constitutional provision facially unconstitutional, is that what you're saying?" Oral Arg. at 31:10. With a proper dose of levity but a dead-serious point too, the Secretary's counsel replied, "Execute us or set us free, your honor." *Id.* at 31:22. Here we do neither, directing the Secretary to seek relief from those able to amend Colorado's statutes to meet the Secretary's concerns.

We thus conclude that Colorado's issue-committee regulatory framework does not satisfy exacting scrutiny in this case. As applied to the Coalition, Colorado's framework is unconstitutional under the First Amendment.

### III. CONCLUSION

As in *Sampson*, we conclude that Colorado's issue-committee regulatory framework is unconstitutional as applied to the Coalition. The government's modest informational interest in the Coalition's disclosures is not reflected in the burdens Colorado law imposes on the Coalition. We therefore affirm.