**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**September 9, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

RIO GRANDE FOUNDATION,

    Plaintiff - Appellant,

and

ILLINOIS OPPORTUNITY
PROJECT,

    Plaintiff,

v.

MAGGIE TOULOUSE OLIVER, in
her official capacity as Secretary of
State of New Mexico,

    Defendant - Appellee.

No. 24-2070

_____

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. 1:19-CV-01174-JCH-JFR)**

_____

Jeffrey M. Schwab of Liberty Justice Center, Austin, Texas, for Plaintiff - Appellant.

Ellen L. Venegas, Assistant Solicitor General, Santa Fe, New Mexico (Raúl Torrez, New Mexico Attorney General; Seth C. McMillan, Deputy Solicitor General, Santa Fe, New Mexico; Alexander W. Tucker, Assistant Solicitor General, Albuquerque, New Mexico, with her on the brief), for Defendant - Appellee.

_____

Before **HARTZ**, **EID**, and **FEDERICO**, Circuit Judges.

_____

**FEDERICO**, Circuit Judge.

_____

This case concerns First Amendment rights in the context of electioneering laws. Rio Grande Foundation (RGF) is a nonprofit advocacy group challenging an amendment to New Mexico's Campaign Reporting Act (CRA). It argues the CRA disclosure law unlawfully burdens its First Amendment rights and chills potential donors from making donations.[1] RGF sought to enjoin New Mexico's Secretary of State (Secretary) from enforcing certain disclosure requirements in the amended CRA.

The district court ruled in favor of the Secretary and determined that the CRA disclosure requirements are substantially related and narrowly tailored to the governmental and public interest in knowing who is funding large election-related advertisements about a candidate or ballot measure shortly before an election. We agree with the district court.

---

[1] Illinois Opportunity Project, another nonprofit advocacy group, was a plaintiff, but its claims were previously dismissed for a lack of standing and mootness. *See Rio Grande Found. v. Oliver*, 57 F.4th 1147, 1165 (10th Cir. 2023).

## I[2]

We proceed in this section by first explaining the CRA: who and what it covers, its limitations, and the applicable definitions. Next, we discuss RGF: what it is, what it does, and what it intends to do. Last, we set out the procedural history of this lawsuit to frame the current appeal.

### A

Senate Bill 3 (2019) amended the CRA to include disclaimer and disclosure requirements for certain electioneering communications. *Campaign Finance Reporting Act*, ch. 262, 2019 N.M. Laws § 1. A violation of the CRA is a misdemeanor punishable "by a fine of not more than one thousand dollars ($1,000) or by imprisonment for not more than one year or both." N.M. Stat. Ann. § 1-19-36(A). The state ethics commission may also institute a civil action for violations of the CRA. *Id*. § 1-19-34.6(B), (C).

The amended CRA requires "political committees" to register with the Secretary and to disclose (1) the name of the committee with any sponsoring organization and its address; (2) a statement of purpose; (3) the names and addresses of the officers of the committee; and (4) any bank account used for contributions or expenditures. *Id*. § 1-19-26.1(B), (C). The CRA defines a "political committee" as (1) "a political party;" (2) "a legislative caucus

---

[2] Unless otherwise indicated, the following facts are not in dispute.

committee;" (3) "an association that consists of two or more persons whose primary purpose is to make contributions to candidates, campaign committees or political committees or make coordinated expenditures or any combination thereof;" or (4) "an association that consists of two or more persons whose primary purpose is to make independent expenditures and that has received more than five thousand dollars ($5,000) in contributions or made independent expenditures of more than five thousand dollars ($5,000) in the election cycle." *Id.* § 1-19-26(U). The parties agree that RGF qualifies as a political committee.

Further, an "expenditure" is defined as "a payment, transfer or distribution or obligation or promise to pay, transfer or distribute any money or other thing of value for a political purpose[.]" *Id.* § 1-19-26(P). A "political purpose" "means for the purpose of supporting or opposing a ballot question or the nomination or election of a candidate." *Id.* § 1-19-26(W).

The amended CRA also requires political committees to disclose the names and addresses of their donors if their "independent expenditures" exceed a certain amount:

> A person who makes independent expenditures required to be reported under this section in an amount totaling more than three thousand dollars ($3,000) in a nonstatewide election or nine thousand dollars ($9,000) in a statewide election, in addition to reporting the information specified in Subsection C of this section, shall either:

4

(1) if the expenditures were made exclusively from a segregated bank account consisting only of funds contributed to the account by individuals to be used for making independent expenditures, report the name and address of, and amount of each contribution made by, each contributor who contributed more than two hundred dollars ($200) to that account in the election cycle; or

(2) if the expenditures were made in whole or part from funds other than those described in Paragraph (1) of this subsection, report the name and address of, and amount of each contribution made by, each contributor who contributed more than a total of five thousand dollars ($5,000) during the election cycle to the person making the expenditures; provided, however, that a contribution is exempt from reporting pursuant to this paragraph if the contributor requested in writing that the contribution not be used to fund independent or coordinated expenditures or to make contributions to a candidate, campaign committee or political committee.

*Id.* § 1-19-27.3(D). The independent expenditure reports filed under these laws may be accessed "via the internet" and are "in an easily searchable format." *Id.* § 1-19-32(C).

The CRA defines an "independent expenditure" as one that is (1) "made by a person other than a candidate or campaign committee" and (2) "not a coordinated expenditure as defined in the [CRA]." *Id.* § 1-19-26(Q). Additionally, it is "made to pay for an advertisement that:"

(a) expressly advocates the election or defeat of a clearly identified candidate or the passage or defeat of a clearly identified ballot question;

5

(b) is susceptible to no other reasonable interpretation than as an appeal to vote for or against a clearly identified candidate or ballot question; or

(c) refers to a clearly identified candidate or ballot question and is published and disseminated to the relevant electorate in New Mexico within thirty days before the primary election or sixty days before the general election at which the candidate or ballot question is on the ballot.

*Id.* § 1-19-26(Q)(3). Notably, certain contributors may opt-out of these requirements if they request "in writing" that their "contribution not be used to fund independent or coordinated expenditures or to make contributions to a candidate, campaign committee or political committee." *Id.* § 1-19-27.3(D)(2).

The amended CRA further imposes disclaimer requirements, requiring a "person who makes a campaign expenditure, a coordinated expenditure or an independent expenditure for an advertisement in an amount that exceeds one thousand dollars ($1,000), or in an amount that, when added to the aggregate amount of the campaign expenditures, coordinated expenditures and independent expenditures for advertisements made by the same person during the election cycle, exceeds one thousand dollars ($1,000)," to "ensure that the advertisement contains the name of the candidate, committee or other person who authorized and paid for the advertisement." *Id.* § 1-19-26.4(A). This requirement does not apply to "(1)

6

bumper stickers, pins, buttons, pens and similar small items upon which the disclaimer cannot be conveniently printed; or (2) skywriting, water towers, wearing apparel or other means of displaying an advertisement of such a nature that the inclusion of a disclaimer would be impracticable." *Id.* § 1-19-26.4(B).

**B**

RGF is a charitable organization pursuant to 26 U.S.C. § 501(c)(3) whose mission is to inform New Mexico's citizens "of the importance of individual freedom, limited government, and economic opportunity." Aplt. App. at 30. To support this mission, "RGF engages in issue advocacy in New Mexico." *Id.* at 31. For example, it publishes a "Freedom Index," which "tracks New Mexico state legislators' floor votes on bills important to RGF." *Id.* RGF's publication of the Freedom Index is online, but RGF contends that it had planned to mail its Freedom Index to New Mexico voters within sixty days of the November 2020 general election. According to RGF, it did not follow through with this plan because of the amended CRA's disclosure requirements.

The parties dispute the extent of RGF's concerns about the risks of donor disclosure. RGF fears that its members, supporters, and donors would be subject to harassment by "intolerant elements in society" due to the organization's controversial positions. *Id.* at 32. RGF's president, Paul

Gessing, declared that he was personally aware of instances where donors to organizations with similar views were subject to retaliation and harassment, such as boycotts, online harassment, and social ostracism. Gessing also declared that donor disclosure requirements would lessen contribution from individuals, organizations, and corporations. He asserted that he knows of several donors who would not continue supporting RGF if it is subject to donor disclosure requirements.[3]

## C

RGF filed a complaint against the Secretary in December 2019, and an amended complaint in February 2020, challenging the above disclosure and disclaimer requirements. In its amended complaint, RGF asserted that it hoped to send advertisements that would be subject to the amended CRA before the November 2020 general election. It requested injunctive and declaratory relief, claiming that requiring it to disclose its members and supporters violated its rights to free association and speech and that requiring it to register and disclose its sponsorship of issue advocacy also violated its free speech rights.

---

[3] Although Gessing made this assertion in his declaration, during his subsequent deposition he testified that RGF "donors have not stated that they would not donate if their information were public." Aplt. App. at 72.

In August 2020, RGF moved for a preliminary injunction. The district court denied the motion, after which the parties proceeded to discovery. Both parties then filed cross-motions for summary judgment. Making a facial challenge to the amended CRA, RGF argued the disclosure and disclaimer requirements were unconstitutional. In its response and cross-motion, the Secretary argued that RGF lacked standing to bring a facial challenge because they were not injured by the challenged laws, alternatively arguing that the law withstands constitutional scrutiny.

The district court granted the Secretary's motion for summary judgment, determining RGF lacked Article III standing. RGF timely appealed and this court reversed in part, holding that RGF has standing to pursue its challenge to the disclosure requirement but lacks standing to pursue its challenge to the disclaimer requirement. *Rio Grande Found. v. Oliver*, 57 F.4th 1147, 1162, 1165 (10th Cir. 2023). We further concluded that the case was not moot because "determining the law's constitutionality would have a real effect on RGF." *Id.* at 1165–66.

Following remand to the district court, both parties again filed cross-motions for summary judgment on the legality of the amended CRA's disclosure requirement. The district court denied RGF's motion while granting the Secretary's motion, reasoning that the disclosure requirements are substantially related and narrowly tailored to the governmental and

9

public interest in knowing who is funding large election-related advertisements about a candidate or ballot measure shortly before an election.

RGF timely appeals, challenging the district court's interpretation of the CRA, as well as its decision to grant the Secretary summary judgment. We have jurisdiction over this appeal from 28 U.S.C. § 1291.

## II

We review summary judgment decisions de novo and apply the same standard as the district court. *Koel v. Citizens Med. Ctr., Inc.*, 128 F.4th 1329, 1333 (10th Cir. 2025). Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if, under the governing law, it could influence the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a material fact is "genuine" if a rational jury could find in favor of the nonmovant on the evidence presented. *Id.* We must construe all facts and reasonable inferences in the light most favorable to the nonmovant. *Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co.*, 52 F.3d 1522, 1527 (10th Cir. 1995).

When, as here, the parties filed cross motions for summary judgment, "we are entitled to assume that no evidence needs to be considered other

than that filed by the parties, but summary judgment is nevertheless inappropriate if disputes remain as to material facts." *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000). Because this is a First Amendment challenge, "[o]ur review of the record is more rigorous." *Essence, Inc. v. City of Fed. Heights*, 285 F.3d 1272, 1283 (10th Cir. 2002); *Rio Grande Found.*, 57 F.4th at 1153.

RGF argues that the disclosure requirements under section 1-19-26(Q)(3)(c) are facially unconstitutional under a traditional facial analysis and an overbreadth analysis. For a traditional facial challenge to succeed, there must be no set of circumstances that exist under which the law would be valid, or the law must lack "a plainly legitimate sweep." *Americans for Prosperity Foundation v. Bonta*, 594 U.S. 595, 615 (2021) (citation omitted). Facial challenges are disfavored, but we have said that they can best be understood as "a challenge to the terms of the [law], not hypothetical applications." *United States v. Supreme Court of New Mexico*, 839 F.3d 888, 917 (10th Cir. 2016) (citation omitted). We do not "conjure up whether or not there is a hypothetical situation in which application of the [law] might be valid." *Id.* (citation omitted). Likewise, in the First Amendment context, "a second type of facial challenge" has been recognized, "whereby a law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate

11

sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010) (internal quotation marks and citation omitted).

## III

RGF's opposition to the amended CRA includes both a statutory construction argument and a constitutional challenge. We must first explore the meaning of the amended CRA and whether the district court erred in concluding that an advertisement that merely refers to a candidate or ballot question is made for a political purpose.[4] We next examine whether the district court erred in granting the Secretary summary judgment, necessarily also concluding the amended CRA does not unlawfully violate RGF's First Amendment rights.

## A

The district court concluded that an advertisement published and disseminated shortly before an election, that refers to a candidate or ballot question, has a political purpose under the amended CRA. Aplt. App. at 173. RGF contends that this interpretation of the statute is flawed, and both parties agree this is a threshold question that we must decide first because it frames the constitutional analysis. In other words, because RGF argues

---

[4] RGF does not argue that the CRA has no applicability to its activities. Also, RGF does not bring an as-applied constitutional challenge but instead a facial challenge to one subsection of the amended CRA.

the CRA is overbroad in its application, we must consider the scope of the speech that it captures.

RGF focuses its challenge on section 1-19-26(Q)(3)(c),[5] contending that advertisements covered under this subsection of the definition of an "independent expenditure" cannot have a political purpose because this subsection necessarily excludes the advertisements found in the preceding two subsections. That is, section (3)(c) advertisements do not include those that are expressly political advertisements (the advertisements that fall under section (3)(a)), as well as advertisements that are "susceptible to no other reasonable interpretation than as an appeal to vote for or against" a particular candidate or ballot question (the advertisements that fall under section (3)(b)). *See* N.M. Stat. Ann. § 1-19-26(Q)(3)(a), (b).

Moreover, RGF argues that section (3)(c) sweeps up too much speech, is overly broad, and fails to achieve its intended objective because the "only reasonable interpretation of [section (3)(c)] is that it applies to all [advertisements], regardless of purpose, that simply mention, but do not advocate and cannot reasonably be interpreted as advocating for or against a candidate or ballot initiative within [thirty] days before a primary and [sixty] days before a general election." Op. Br. at 29. But RGF's argument

---

[5] For simplicity, we refer to section 1-19-26(Q)(3)(c) as section (3)(c).

13

misconstrues section (3)(c) and is contradicted by both the text of the CRA and binding precedents.

We start with the text of the CRA, which in section (3)(c) provides that an "independent expenditure" includes paid advertisements that "refer[] to a clearly identified candidate or ballot question and [are] published and disseminated" to New Mexico residents shortly before an election. N.M. Stat. Ann. § 1-19-26(Q)(3)(c). Relevant here, an "expenditure" is a payment made "for a political purpose," *id.* § 1-19-26(P), and a "political purpose" "means for the purpose of supporting or opposing a ballot question or the nomination or election of a candidate," *id.* § 1-19-26(W). Considering this, an independent expenditure, by definition, *must* be made for a political purpose. There can be no reasonable interpretation otherwise because the "political purpose" component is embedded within the roots of the definition of an "independent expenditure."

To interpret section (3)(c) we must look to the entire definition of "independent expenditure." *Resolution Trust Corp. v. Love*, 36 F.3d 972, 976 (10th Cir. 1994). Again, RGF does not challenge sections (3)(a) and (b), but they are relevant to our reading and interpretation of section (3)(c) because we must read this section in light of the statutory scheme as a whole. *Seminole Nursing Home, Inc. v. Comm'r of Internal Revenue*, 12 F.4th 1150, 1156 (10th Cir. 2021) (internal citations omitted).

14

Section (3)(a) covers express advocacy advertisements, whereas section (3)(b) covers implied advocacy that "is susceptible to no other reasonable interpretation" than to have a political purpose (or the functional equivalent of express advocacy). But there could also be implied advocacy advertisements that could be reasonably interpreted as having or not having a political purpose. Even if the advertisement may not be an obvious or express attempt to influence New Mexico voters by telling them how to vote, its more subtle political purpose may lie beneath.

Perhaps unwittingly, RGF acknowledges this distinction in its reply brief. When discussing the definition of "political purpose," it says the purpose can be demonstrated by "an [advertisement] that either expressly advocates for or against a candidate or ballot initiative or can reasonably be interpreted as advocating for or against a candidate or ballot initiative." Reply Br. at 10. Exactly right. Section (3)(c) advertisements are those that could reasonably be interpreted to advocate for or against a candidate or ballot initiative, even if they are susceptible to another reasonable interpretation of their purpose. But there is also more to the section (3)(c) definition that ensures that any such advertisements are published for a political purpose.

More fatal to RGF's statutory construction argument is that it puts a spotlight only on the first portion of section (3)(c) but ignores or reads out

15

of the statute the temporal and distribution components of the definition. When searching for statutory meaning, we must give effect, if possible, to every clause or word of the statute. *Loughrin v. United States*, 573 U.S. 351, 358 (2014).

The district court correctly observed "[t]he timing of the expenditures on [advertisements] shortly before an election indicate the political purpose of such [advertisements]." Aplt. App. at 173. Section (3)(c) only covers those advertisements that, within the relevant thirty-day time frame (before a primary election) or sixty-day time frame (before a general election), are "disseminated to the relevant electorate in New Mexico." N.M. Stat. Ann. § 1-19-26(Q)(3).

Both the temporal and distribution components of section (3)(c), ignored by RGF, are constitutional guardrails that significantly increase the likelihood that any speech covered by section 3(c) is made for a political purpose. Reading the entirety of the definition of "independent expenditure" together with the definition of "expenditure" as a payment made "for a political purpose," *id.* § 1-19-26(P), we see that these sections work in harmony to capture only speech that expressly or implicitly is made for a political purpose. Thus, the temporal and distribution components of (3)(c) justify a lesser showing that the speech is made for a "political purpose"

because the timing and geographic area of dissemination are highly relevant to the reasonable interpretation of the expenditure's purpose.

RGF also argues that its reading of section (3)(c) prevails because an independent expenditure is traditionally understood to be express or tacit political advocacy, citing *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 319 (2010). But RGF misinterprets Supreme Court precedent. In *Citizens United*, the Court held that disclosure requirements are not limited to expressly political speech *or* its functional equivalent. *See id.* at 369 ("[W]e reject Citizens United's contention that the disclosure requirements must be limited to speech that is the functional equivalent of express advocacy."). That is because a disclosure law "is a less restrictive alternative to more comprehensive regulations of speech." *Id.*

Citing *Citizens for Responsible Gov't State Pol. Action Comm. v. Davidson*, 236 F.3d 1174, 1194 (10th Cir. 2000), RGF insists that "the First Amendment shields communications that do not advocate the election or defeat of a candidate." Op. Br. at 27. But if there is any tension between our decision in *Davidson* and *Citizens United* (decided ten years after *Davidson*), the latter prevails. In this case, we must and do faithfully apply *Citizens United*'s rejection of the argument that only express advocacy, or its functional equivalent can be subject to disclosure requirements. *See Citizens United*, 558 U.S. at 369.

17

Although express and implicit political advocacy are protected by the First Amendment, this protection is not so absolute as to escape all state regulation. *Independence Institute v. Williams*, 812 F.3d 787, 791 (10th Cir. 2016) (Supreme Court precedent permits disclosure requirements for certain advertisements prior to an election even if they "make no obvious reference to a campaign.").[6] Applying this precedent to the text of the CRA, the district court correctly concluded that advertisements under section (3)(c) have a political purpose. The district court determined that an advertisement "may refer to a candidate or ballot question, without being so overt as to constitute express advocacy or its functional equivalent, but still have been published for the purpose of supporting or opposing a ballot question or the nomination or election of a candidate." Aplt. App. at 173. It highlighted that such advertisements are disseminated shortly before elections and such timing implies a political purpose.

We agree with the district court that section (3)(c) properly carves out a third category of independent expenditures that are spent on

---

[6] *See also Free Speech v. Fed. Election Comm'n*, 720 F.3d 788, 795 (10th Cir. 2013); *Gaspee Project v. Mederos*, 13 F.4th 79, 86 (1st Cir. 2021); *Delaware Strong Fams. v. Att'y Gen. of Delaware*, 793 F.3d 304, 308 (3d Cir. 2015); *Ctr. for Individual Freedom v. Madigan*, 697 F.3d 464, 484 (7th Cir. 2012); *Hum. Life of Washington, Inc. v. Brumsickle*, 624 F.3d 990, 1016 (9th Cir. 2010).

advertisements published for a political purpose. It is not as broad as RGF claims it to be. We again emphasize, however, that advertisements must be reasonably interpreted as advocacy (even if another reasonable mind would conclude otherwise) for those advertisements to properly fall within the purview of section (3)(c), whether through their timing or otherwise. Given this interpretation, we now move to RGF's constitutional challenge to the section (3)(c) of the CRA.

## B

Given RGF's facial challenge, we must next decide whether section (3)(c) survives constitutional scrutiny.[7] Neither party disputes that First Amendment rights are implicated by section (3)(c). Political speech is at the "highest rung of the hierarchy of First Amendment values." *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 913 (1982) (citation omitted). Also, the Supreme Court has "long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others." *Bonta*, 594 U.S. at 606 (quoting *Roberts v. United*

---

[7] RGF first argued in its briefs that we must apply strict scrutiny to this law. However, RGF conceded during oral argument that an exacting scrutiny applies. Oral Arg. at 18:47–19:50. It presents a strict scrutiny argument purely for preservation purposes, while acknowledging that binding authority requires the application of exacting scrutiny. *See Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 607 (2021).

*States Jaycees*, 468 U.S. 609, 622 (1984)). The Court has explained that "compelled disclosure of affiliation with groups engaged in advocacy" may constitute "a restraint on freedom of association" protected by the First Amendment. *Id.* (quoting *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958)).

Exacting scrutiny "applies to First Amendment challenges to compelled disclosure." *Id.* at 607; *see also Citizens United*, 558 U.S. at 366–67 (applying the exacting scrutiny standard to disclosure laws). Exacting scrutiny requires "a substantial relation between the disclosure requirement and a sufficiently important governmental interest." *Id.* (citation omitted).

To withstand exacting scrutiny, "the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights." *Id.* (citation omitted). "Such scrutiny . . . is appropriate given the 'deterrent effect on the exercise of First Amendment rights' that arises as an 'inevitable result of the government's conduct in requiring disclosure.'" *Id.* (citation omitted). And although "exacting scrutiny does not require that disclosure regimes be the least restrictive means of achieving their ends, it does require that they be narrowly tailored to the government's asserted interest." *Id.* at 608.

**1**

We start with New Mexico's interest in requiring disclosures of the donors who make qualifying independent expenditures. RGF concedes that there is an important governmental interest in the public knowing who is advocating for or against candidates and ballot questions. Op. Br. at 38. It nonetheless argues that advertisements under section (3)(c) do not advocate for or against candidates or ballot questions, so disclosures would tell "voters absolutely nothing." *Id.* at 39. Which is to say, RGF contends that section (3)(c) only regulates speech that does not amount to election-related advocacy. But as we have already established, section (3)(c) covers only those advertisements that can reasonably be interpreted to have a political purpose. *See* N.M. Stat. Ann. § 1-19-26(P) (defining "expenditure" as payments made "for a political purpose"). Therefore, disclosure of these expenditures would provide the public with information about who is advocating for or against a candidate or ballot question. *See id.* § 1-19-26(W) (defining a "political purpose" as "supporting or opposing a ballot question or the nomination or election of a candidate").

RGF publishes and disseminates to New Mexico voters a "Freedom Index," which tracks New Mexico state legislators' floor votes on bills important to RGF, and which RGF has described as a "report card." Aplt. App. at 111. The Freedom Index gives numerical scores to each legislator. Legislators who supported legislation RGF deems favorable receive higher

21

scores in green, while those who did not support this legislation receive lower scores in red.

At oral argument, RGF asserted that such color-coding is "meaningless." Oral Arg. at 8:00–8:30. We cannot agree, and no New Mexico voter would be so easily fooled. There is no doubt that RGF intends for the "green" to signify a good or favorable candidate, while red signifies a bad or unfavorable candidate. After all, in this country we are hard-wired to know that green means go, and red means stop. The Freedom Index then combines the color coding with the numerical scores on a "report card," which signal which legislators pass, and which legislators fail.[8] The combination of the two, color-coding and a numerical "report card," reflects

_____

[8] Given this conclusion, the Freedom Index would likely fall under section (3)(b) because it "is susceptible to no other reasonable interpretation than an appeal to vote for or against a clearly identified candidate[.]" N.M. Stat. Ann. § 1-19-26(Q)(3)(b). However, the Secretary conceded that it may fall under section (3)(c). Given that this distinction does not change the outcome of this appeal, we accept this concession and consider the Freedom Index as a section (3)(c) advertisement.

an obvious intent by RGF to influence voters to vote for and against specific legislators.[9]

RGF attempts to create a parallel to *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334 (1995), where the Supreme Court held that "Ohio's informational interest [was] plainly insufficient to support the constitutionality of its disclosure requirement" because merely "providing voters with additional relevant information" is inadequate, and "in the case of a handbill written by a private citizen who is not known to the recipient, the name and address of the author add little, if anything, to the reader's ability to evaluate the document's message." *Id.* at 348–49. As the district court noted, however, *McIntyre* is easily distinguishable from the case at hand, which involves the disclosure of relatively large expenditures meant to influence elections on a wide scale, not the in-person distribution of anonymous handbills. *See Citizens United*, 558 U.S. at 371 (stating

---

[9] Responding to a hypothetical during oral argument, the Secretary pointed out that if the Freedom Index contained neither the numerical scores nor the color-coding, then it may not be captured under the definition of an "independent expenditure" but may instead be considered a "nonpartisan voter guide." N.M. Stat. Ann. § 1-19-26(A)(4). The nonpartisan voter guides are exempted from the definition of an "advertisement" and do not trigger the disclosure requirement. *Id.* However, neither party suggests the RGF Freedom Index falls under this exemption.

expenditure disclosure "enables the electorate to make informed decisions and give proper weight to different speakers and messages"); *First Nat. Bank of Boston v. Bellotti*, 435 U.S. 765, 792 n.32 (1978) ("Identification of the source of advertising may be required as a means of disclosure, so that the people will be able to evaluate the arguments to which they are being subjected.").

The Secretary explains that the state has an informational interest in the disclosure of donors spending large amounts to fund advertisements covered by section (3)(c). *See Wyoming Gun Owners v. Gray*, 83 F.4th 1224, 1244 (10th Cir. 2023) ("The Supreme Court has long accepted the informational interest as an important one."). In support, the Secretary again highlights the timing of such advertisements because they are published and disseminated shortly before elections. *See Citizens United*, 558 U.S. at 369 ("[T]he public has an interest in knowing who is speaking about a candidate shortly before an election."); *Gaspee Project v. Mederos*, 13 F.4th 79, 93 (1st Cir. 2021) ("The fact that the [*Citizens United*] Court did not adopt the *McIntyre* framework in the election-law context speaks eloquently to its inapplicability."). As discussed, independent expenditures under section (3)(c) are inherently made for a political purpose by their very definition. *See* N.M. Stat. Ann. § 1-19-26(P), (W). And although section (3)(c) may not implicate the most obvious, express form of political advocacy, it

24

captures its functional equivalent or implicit political advocacy when it would reasonably be interpreted as having this purpose.

Importantly, in *Independence Institute* we explained that the "logic of *Citizens United* is that advertisements that mention a candidate shortly before an election are deemed sufficiently campaign-related to implicate the government's interests in disclosure." 812 F.3d at 796. We further noted that "the Court in *Citizens United* was nearly unanimous in applying . . . disclosure requirements both to Citizens United's express advocacy and to [advertisements] that did not take a position on a candidacy." *Id.*; *see also Human Life of Wash., Inc. v. Brumsickle*, 624 F.3d 990, 1016 (9th Cir. 2010) ("Given the Court's analysis in *Citizens United*, and its holding that the government may impose disclosure requirements on speech, the position that disclosure requirements cannot constitutionally reach issue advocacy is unsupportable."). Simply put, because we deem advertisements under section (3)(c) to be made for a political purpose, we have no trouble concluding that New Mexico has an important governmental interest to give

25

the electorate useful information about who is paying for these advertisements.[10]

**2**

We next look to whether the Secretary has shown a substantial relationship between the CRA's burden on speech and association and the interest described above. "[T]he strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights." *John Doe No. 1 v. Reed*, 561 U.S. 186, 196 (2010) (quoting *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 744 (2008)). The Secretary argues the government's interest in disclosure is "critical," and notes that several limitations were imposed in the amended CRA to tighten the regulation and ensure its relation to the important interest of New Mexico. Resp Br. at 34 (quoting *Nat'l Assn. for Gun Rights, Inc. v. Mangan*, 933 F.3d 1102, 1114 (9th Cir. 2019)).

---

[10] Section (3)(c) covers both candidates and ballot questions. We have previously said "the justifications for requiring disclosures in a candidate election may not apply, or may not apply with as much force, to a ballot initiative." *Sampson v. Buescher*, 625 F.3d 1247, 1249 (10th Cir. 2010). Regardless of this distinction in the case law, RGF does not argue that its speech or other activities are limited to (or even implicate) ballot questions, even though it brings a facial challenge. And because RGF does not parse this distinction to make this argument, we decline to do so on its behalf. *State v. EPA*, 989 F.3d 874, 885 (10th Cir. 2021).

Generally, requiring the disclosure of donor information related to advertisements intended to influence voters is important to the state's "interest in promoting transparency and discouraging circumvention of its electioneering laws." *Mangan*, 933 F.3d at 1114. RGF argues that the district court erred in "simply accept[ing]" the Secretary's argument "because it applies to [advertisements] that mention a candidate or ballot initiative." Op. Br. at 51. Here again, RGF's argument is dependent upon its interpretation of the breadth of section (3)(c), which we reject. Rather, given the best textual interpretation of section (3)(c), the relationship between the state's informational interest in election advocacy communications and the disclosures is somewhat self-evident.

Moreover, the Secretary correctly highlights the limitations placed on the CRA's disclosure requirements. Expenditures that do not fall within certain monetary, temporal, and geographic ranges are not required to be disclosed. On top of this, the Secretary also highlights the CRA's opt-out provision, which provides even more flexibility for potential donors. *See* N.M. Stat. Ann. § 1-19-27.3(D)(2). The Secretary explains that the CRA focuses on "large donors who do not opt out of supporting advertisements and who support expenditures designed to influence the relevant electorate, within a short period of time prior to an election." Resp. Br. at 35; *see also Independence Institute*, 812 F.3d at 792–93; *cf. Sampson v. Buescher*, 625

27

F.3d 1247, 1259 (10th Cir. 2010) (recognizing that the public's interest is "significantly attenuated when the organization is concerned with only a single ballot issue and when the contributions and expenditures are slight"). In all, the Secretary has shown that the CRA disclosure requirement is substantially related to an important government interest.

**3**

Lastly, we consider whether the CRA is narrowly tailored enough to withstand exacting scrutiny. RGF argues, again, that section (3)(c) "casts too wide a net and covers speech that is not relevant to the government's informational interest." Reply Br. at 25. It also contends that donors whose funds go to such advertisements will not "understand" the CRA's opt-out provision or will require donors to "micromanage their donations." Op. Br. at 46–47. Additionally, RGF argues that "social science shows that donor information is substantially less useful information for voters than party affiliation and major endorsements." *Id.* at 55. These arguments fail to persuade us.

To demonstrate narrow tailoring, the Secretary must establish its need for the disclosure provisions in light of any less intrusive alternatives. *Wyoming Gun Owners*, 83 F.4th at 1247. The Secretary again points to the following: (1) temporal limitations, (2) monetary thresholds, (3) earmarking, (4) the opt-out provision, and (5) geographic range. The CRA

limits disclosure requirements to relatively large independent expenditures made shortly before an election, targeting New Mexico voters, and it provides an opt-out for the donors. As the Secretary points out, the CRA requires the disclosure of major funders of significant election advertisements, "while closing loopholes that would leave the [CRA] toothless." Resp. Br. at 43. The Secretary contends that the law seeks to disclose who is attempting to influence elections and that the law is properly confined using narrow tailoring through several means. We agree.

RGF argues, and the dissent concludes, that this degree of narrow tailoring is insufficient to survive exacting scrutiny. The dissent proposes further limiting measures that New Mexico could have taken, dissent at 8, but "exacting scrutiny does not require that disclosure regimes be the least restrictive means of achieving their ends[.]" *Bonta*, 594 U.S. at 608; *see also McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 218 (2014) ("[W]hen the Court is not applying strict scrutiny, we still require a fit that is not necessarily perfect, but reasonable[.]" (internal quotation marks omitted)).

The dissent states that (3)(c) advertisements do "not provide voters with quality information about who is commenting on a candidate or ballot question during election season" because it applies "even to general fund donors." Dissent at 7. Additionally, the dissent concludes the CRA amounts to an overbroad inclusion of donors who do not support political advocacy

29

but may donate to campaigns that "endeavor only to inform the electorate by disseminating information about candidates and ballot questions[.]" *Id*. at 9.

However, it is reasonable to infer that people who make larger donations to a political committee, such as RGF, are people who agree with its point of view and want to support its mission to promote that point of view to New Mexico's citizens. Again, the purpose of (3)(c) is to notify the public who is financing a political advertisement prior to an election, which supports "the public's interest 'in knowing who is speaking about a candidate shortly before an election.'" *Independence Institute*, 812 F.3d at 796 (quoting *Citizens United*, 558 U.S. at 369).

Also, if the political committee's endeavor is truly just to inform, then the advertisement would not have been made for a "political purpose" and would not count as an "independent expenditure." *See* N.M. Stat. Ann. § 1-19-26(P), (W). While some political advertisements captured under section (3)(c) may cause voters to have different, but reasonable, interpretations of whether an advertisement is for a political purpose, large donors giving to a political committee, right before an election, are certain to be aware of the advertisement's political purpose. To say nothing of the opt-out provision, wherein these same large donors have the option to avoid disclosure by making their donations limited to the general fund by

30

requesting in writing that their donation not be used to fund independent expenditures (made for a political purpose). *Id*. at § 1-19-2703(D)(2).

By erecting guardrails and an opt-out, the CRA is narrowed to only capture larger expenditures that are express advocacy or made at a particular time and to a certain audience that make them the functional equivalent. RGF's arguments about the wide net, donor confusion, and social science do not defeat the narrowness of the CRA's structure. The CRA is properly, narrowly tailored and thus survives the application of exacting scrutiny.

**4**

As a final matter, RGF filed with the district court a declaration from its president, Paul Gessing, which generally describes how and why the CRA may chill potential donors who fear retaliation if they must disclose their contributions and associations. The district court analyzed the evidence of chilled speech when examining New Mexico's informational interest in requiring disclosure. In other words, at the first analytical step during the application of exacting scrutiny.

RGF insists this was error because, relying on *Bonta*, it argues the burden of the chilled speech "outweighs the strength of the government's interest only where a disclosure requirement has been found to be narrowly tailored." Op. Br. at 56 (citing *Bonta*, 594 U.S. at 611, 617). In other words,

31

a court must consider the burden only after it concludes that a disclosure law is narrowly tailored at the final step of the exacting scrutiny analysis. The Secretary disagrees and argues that *Bonta* "did not impose a particular order of operations," and "the district court appropriately structured its opinion." Resp. Br. at 35–36.

*Bonta* says, "that a reasonable assessment of the burdens imposed by disclosure should begin with an understanding of the extent to which the burdens are unnecessary, and that requires narrow tailoring." 594 U.S. at 611. It thus implicitly invokes the government's interest (after all, if there is no interest then the burdens would be unnecessary) and it is the interest analysis which leads to a narrow tailoring requirement.

So far, we have assessed the CRA by putting the Secretary to the burden of demonstrating how the CRA withstands exacting scrutiny. But *Bonta* also discussed a potential burden on a plaintiff who brings a facial challenge to show "that donors to a substantial number of organizations will be subjected to harassment and reprisals." *Id.* at 617. In this context, "plaintiffs *may* be required to bear this evidentiary burden where the challenged regime is narrowly tailored to an important government interest." *Id.* (emphasis added).

This *Bonta* language is most certainly obiter dictum and responsive to an argument made by the dissent in that case. However, we are "bound

32

by Supreme Court dicta almost as firmly as by the Courts' outright holdings, particularly when the dicta is recent and not enfeebled by later statements." *Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1125 (10th Cir. 2015) (quoting *United States v. Serawop,* 505 F.3d 1112, 1122 (10th Cir. 2007); *Surefoot LC v. Sure Foot Corp.,* 531 F.3d 1236, 1243 (10th Cir. 2008)).

Because we have found the CRA is narrowly tailored to an important government interest, RGF *may* be required to bear this evidentiary burden because it brings a facial challenge. And whether RGF's evidence defeats New Mexico's informational interest in requiring donor disclosure (as the district court analyzed) or otherwise dismantles our completed exacting scrutiny analysis is of no concern in this appeal. Either way, the district court was correct at some point to balance RGF's evidence of chilled speech against the legislative interests invoked by the CRA.

More to the point, Gessing's declaration does not establish a present harm to defeat the state's informational interest, nor its narrowly-tailored disclosure law. Rather, his concerns were untethered from concrete facts that would permit a court to find "a reasonable probability that [the disclosure requirements] will subject them [donors] to threats, harassment, or reprisals." *Buckley v. Valeo*, 424 U.S. 1, 74 (1976). Indeed, RGF admitted that it was not aware of any harassment or retaliation of its employees or donors in its over twenty-year history. As the district court found, even

33

viewing the evidence in RGF's favor, the Gessing declaration was simply insufficient to establish a reasonable probability that the compelled disclosures will subject RGF's donors to threats, harassment, or reprisals or otherwise chill donors from making contributions. Which is to say, the record here simply does not support the chilling effect professed by RGF.[11]

## IV

Because the Secretary has demonstrated a substantial relation between the CRA's disclosure requirement and a sufficiently important governmental interest, as well as narrow tailoring, section (3)(c) withstands exacting scrutiny. Accordingly, we **AFFIRM** the district court's order

---

[11] In contrast to the district court's findings, the dissent takes the Gessing declaration to be clear evidence that speech will be chilled because the real-world effects of the disclosure requirements "demonstrate[] the reality of those burdens." Dissent at 3, n.2. But Gessing's speculation and conclusory opinions in his declaration do not support this finding. For example, in the declaration Gessing explained his and RGF's belief that if the donors are disclosed, then they "will be less likely to continue to contribute to [RGF's] mission. . . . I know that several donors who support RGF would not continue to do so if they were subject to disclosure." Aplt. App. at 32-33. But thereafter, Gessing contradicted his own declaration when he testified in his deposition that, "although donors have told RGF that they fear the disclosure of their identify, donors have not stated that they would not donate if their information were made public." *Id*. at 72. The record of chill here is scant and speculative. *See Center for Individual Freedom v. Madigan*, 697 F.3d 464, 482-83 (7th Cir. 2012).

granting summary judgment to the Secretary and denying summary judgment for RGF.[12]

---

[12] As a final matter, we consider Doctor Randy Elf's motion seeking leave to file an amicus brief. Such motions are granted when the "briefing is relevant to the disposition of the case." *New Mexico Oncology & Hematology Consultants, Ltd. v. Presbyterian Healthcare Servs.*, 994 F.3d 1166, 1176 (10th Cir. 2021) (citing Federal Rule of Appellate Procedure 29). The briefing here fails to comply with Federal Rule of Appellate Procedure 29 because it is not useful to the resolution of this case. Accordingly, we deny the motion.

24-2070, *Rio Grande Foundation v. Oliver*

**HARTZ**, J., concurring

I join the opinion of Judge Federico in full because I believe it properly follows controlling precedent. I write separately, however, because I am uncomfortable with the scope of that precedent.

It seems to me that the infringements on free speech imposed by disclosure requirements for expenditures in support of or opposed to ballot initiatives are not only unjustified but are harmful to the public interest. The "reason" to require disclosure is presumably to inform the electorate of who supports or opposes the initiative so that voters can make a better choice. As one circuit court has put it, "[T]he relevant informational goal is to inform voters as to who backs or opposes a given initiative financially, so that the voters will have a pretty good idea of who stands to benefit from the legislation." *Canyon Ferry Baptist Church v. Unsworth*, 556 F.3d 1021, 1033 (9th Cir. 2009) (internal quotation marks omitted).

But experience demonstrates that the most likely effect of disclosures is to facilitate ad hominem arguments. As the Supreme Court recognized 30 years ago when it protected anonymous leafleting regarding a proposed tax levy: "Anonymity . . . provides a way for a writer who may be personally unpopular to ensure that readers will not prejudge her message simply because they do not like its proponent." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 342 (1995).

Why else did the authors of the Federalist Papers publish anonymously? Each of the authors would have brought some baggage to the debate. They preferred that voters

address their arguments on the merits. Yet despite nondisclosure of the authors' identities, the nation somehow has survived. Again quoting *McIntyre*:

> Don't underestimate the common man [or woman]. People are intelligent enough to evaluate the source of anonymous writing. They can see it is anonymous. They know it is anonymous. They can evaluate its anonymity along with its message, as long as they are permitted, as they must be, to read that message. And then, once they have done so, it is for them to decide what is responsible, what is valuable, and what is truth.

514 U.S. at 348 n.11 (internal quotation marks omitted).

Anyone who is distressed by the political discourse in this country, which often amounts to no more than identifying which public figures support (or oppose) a proposition and choosing sides accordingly, may wish to reconsider the wisdom of laws mandating disclosure of expenditures on ballot initiatives.

2

No. 24-2070, *Rio Grande Foundation v. Oliver*
**EID**, J., dissenting.

Under New Mexico's Campaign Reporting Act (the "CRA"), political committees must disclose the names and addresses of certain donors if the funds from those donors are used to pay for advertisements that mention a candidate or ballot question in the weeks preceding an election. *See* N.M. Stat. Ann. § 1-19-26(Q)(3)(c) ("Section (3)(c)"). Once disclosed, the donors' names and addresses are published on an official and "easily searchable" government website. *Id.* § 1-19-32(C). With few exceptions, the CRA leaves political committees who wish to distribute information about candidates or ballot questions during election season with four choices: They may (1) adhere to the laws, and risk losing donors who fear retaliation by intolerant members of society; (2) refuse to make the disclosures, and risk fines or imprisonment; (3) significantly alter their speech to avoid triggering the disclosure requirements; or (4) stop speaking entirely.

Viewing the CRA through rose-colored glasses, the majority concludes that Section (3)(c) satisfies the stringent "exacting" scrutiny standard set forth in *Americans for Prosperity Foundation v. Bonta*, 594 U.S. 595 (2021). I disagree. In my view, Section (3)(c) fails at the narrow-tailoring step of the analysis because it casts too wide a net: It unnecessarily burdens core political speech, ignores serious concerns of retaliation against donors, and disproportionately harms those who hold unpopular beliefs. This far exceeds the bounds of permissible First Amendment

regulation and overlooks less restrictive alternatives for furthering the government's interest in informing the electorate. I respectfully dissent.

## I.

The First Amendment prohibits the government from "abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble." U.S. Const. amend. I. Implicit in these rights is "a corresponding right to associate with others." *Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984). Protected association promotes the advancement of "a wide variety of political, social, economic, educational, religious, and cultural ends, and is especially important in preserving political and cultural diversity and in shielding dissident expression from suppression by the majority." *Ams. for Prosperity Found.*, 594 U.S. at 606 (citation modified).

Disclosure laws threaten First Amendment freedoms in several ways. To begin, they decrease the efficacy of advocacy by deterring the formation of groups. *See NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460 (1958) ("Effective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association."). They endanger dissenting opinions. *Id.* at 462 ("Inviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs."). And in some cases, they lead to significant retaliation against donors—including economic reprisal, loss of employment, and threats of physical violence or death. *Citizens United v. FEC*, 558 U.S. 310, 481–82

(2010) (Thomas, J., concurring in part and dissenting in part) (discussing retaliation against supporters of a 2008 California ballot measure aimed at amending the state constitution to recognize only heterosexual marriages).[1]

These real-world effects undoubtedly chill speech by disincentivizing political activity that would trigger disclosure requirements.[2]  To account for the seriousness of these burdens, the Supreme Court has instructed us to review disclosure requirements under "exacting" scrutiny.[3]  *See Citizens United*, 558 U.S. at 366.  The

---

[1] *See generally No on E v. Chiu*, 85 F.4th 493, 523 (9th Cir. 2023) (Van Dyke, J., dissenting from denial of rehearing en banc) ("When only a minority of the community supports an institution . . . the public disclosure of a person's support for that institution may often invite reprisal.  In contrast, organizations and contributors that are culturally popular at a given time often do not risk similar harm by the surrounding community knowing of the association.  The harms of compelled disclosure inevitably fall unevenly on the unpopular—that is, precisely those groups most in need of First Amendment protection.").

[2] This case demonstrates the reality of those burdens.  At the district court, Rio Grande Foundation's ("RGF") president provided sworn testimony that he was "personally aware of instances where donors to organizations with similar views were subject to retaliation and harassment, including boycotts, online harassment, and social ostracism."  App'x at 179.  These threats—fueled by disclosure laws— inevitably chill speech.  As RGF's president explained, "potential donors will be less likely to contribute to [RGF's] mission if their identities are disclosed," and "several [present] donors . . . [will] not continue to [donate] if they [are] subject to disclosure."  *Id.*; *see id.* at 153 (discussing RGF's decision not to mail certain content because of New Mexico's disclosure laws).

[3] In recent years, several Supreme Court justices have expressed doubt that exacting scrutiny is the proper standard of review for compelled disclosure laws. *Ams. for Prosperity Found.*, 594 U.S. at 620 (Thomas, J., concurring in part and concurring in the judgment) ("Laws directly burdening the right to associate anonymously, including compelled disclosure laws, should be subject to the same [strict] scrutiny as laws directly burdening other First Amendment rights."); *see id.* at 622–23 (Alito, J., concurring in part and concurring in the judgment) (suggesting that strict scrutiny may apply to some disclosure requirements but declining to take a position because the disclosure requirements at issue failed under either standard).  I share these doubts.  But "[b]ecause the Court [has] not overturn[ed] its precedent

3

government bears the burden to show that a disclosure regime survives exacting

scrutiny. *Wyo. Gun Owners v. Gray*, 83 F.4th 1224, 1247 (10th Cir. 2023). "If the

government fails to make that showing, it cannot prevail." *Id.* (quotation omitted).

Understanding—and then applying—any level of First Amendment scrutiny is

often easier said than done. *See Club Madonna Inc. v. City of Miami Beach*, 42 F.4th

1231, 1261–63 (11th Cir. 2022) (Newsom, J., concurring in part and concurring in the

judgment) (discussing the "'exhausting' doctrinal bloat" present in First Amendment

scrutiny jurisprudence (quotation omitted)). The exacting scrutiny standard is no

exception. For some time, we understood exacting scrutiny in compelled disclosure

cases to require "a substantial relation between the disclosure requirement and a

sufficiently important governmental interest." *Indep. Inst. v. Williams*, 812 F.3d 787,

797 (10th Cir. 2016) (quoting *Citizens United*, 558 U.S. at 366–67). But recently, the

Supreme Court tightened our review of disclosure laws. It held that, to survive

exacting scrutiny, a disclosure regime must also "be narrowly tailored to the interest

it promotes, even if it is not the least restrictive means of achieving that end."[4] *Ams.*

*for Prosperity Found.*, 594 U.S. at 610; *see id.* at 609 ("[A] substantial relation to an

---

applying exacting scrutiny to [ ] disclosure requirements, [I] apply exacting scrutiny
here." *Wyo. Gun Owners v. Gray*, 83 F.4th 1224, 1244 (10th Cir. 2023).

[4] Although *Americans for Prosperity Foundation* was a split opinion, a
majority of the Court agreed that exacting scrutiny requires narrow tailoring. *See* 594
U.S. at 608 (plurality opinion); *id.* at 620 (Thomas, J., concurring in part and
concurring in the judgment); *id.* at 622–23 (Alito, J., concurring in part and
concurring in the judgment).

4

important interest is not enough to save a disclosure regime that is insufficiently tailored.").

Although the addition of a narrow-tailoring requirement does not dissolve the doctrinal haze, one thing is certain:  Narrow tailoring gives the exacting scrutiny standard "real teeth."  *Id.* at 622 (Alito, J., concurring in part and concurring in the judgment).  Accordingly, we must be vigilant in ensuring that disclosure laws not only advance an important interest, but are also "proportion[ate] to the interest served."  *Id.* at 609 (quotation omitted).  Our thorough review is essential "where First Amendment activity is chilled—even if indirectly—'because First Amendment freedoms need breathing space to survive.'"  *Id.* (quoting *NAACP v. Button*, 371 U.S. 415, 433 (1963)).

## II.

Applying these principles here, Section (3)(c) cannot withstand exacting scrutiny.  Even assuming the disclosure requirement for Section (3)(c) advertisements bears a substantial relation to a sufficiently important informational interest, New Mexico has not shown the disclosure requirement is narrowly tailored to that interest. Accordingly, I would conclude that Section (3)(c) is facially unconstitutional.[5]

At the outset, I recognize that New Mexico has taken at least some measures to tailor its disclosure laws to serve the public's informational interest.  For example,

---

[5] Because RGF limits its challenge to Section (3)(c), I do not address the constitutional merits of the CRA's remaining disclosure requirements for independent expenditures.  *See* N.M. Stat. Ann. § 1-19-26(Q)(3)(a), (b).

Section (3)(c) includes temporal limitations: Disclosure is required only where the advertisement is disseminated "to the relevant electorate [ ] within thirty days before the primary election or sixty days before the general election at which the candidate or question is on the ballot." N.M. Stat. Ann. § 1-19-26(Q)(3)(c). The CRA also sets monetary thresholds before disclosure is required. *See id.* § 1-19-27.3(D). And it allows some donors to opt out of the disclosure requirements if they request "in writing" that their "contribution not be used to fund independent or coordinated expenditures or to make contributions to a candidate, campaign committee or political committee." *Id.* § 1-19-27.3(D)(2).

But the narrow-tailoring inquiry does not ask whether the government has "made some effort" to limit the scope of a disclosure regime. Our precedents demand more: As explained, government regulation of First Amendment rights must be "proportion[ate] to the interest served." *Ams. for Prosperity Found.*, 594 U.S. at 609 (quotation omitted); *id.* ("In the First Amendment context, fit matters." (quotation omitted)); *see McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 348 (1995) ("The simple interest in providing voters with additional relevant information does not justify a state requirement that a writer make statements or disclosures she would otherwise omit."). Further, "[b]eyond proving a balanced relationship between the disclosure scheme's burdens and the government's interests, the government must 'demonstrate its need' for the disclosure regime 'in light of any less intrusive alternatives.'" *Wyo. Gun Owners*, 83 F.4th at 1247 (quoting *Ams. for Prosperity Found.*, 594 U.S. at 614). And here, even accounting for New Mexico's tailoring

6

efforts, there is a "dramatic mismatch" between the informational interest and "the disclosure regime that [New Mexico] has implemented in service of that end." *Ams. for Prosperity Found.*, 594 U.S. at 612.

To begin, the disclosure requirement for advertisements under Section (3)(c) does not provide voters with quality information about who is commenting on a candidate or ballot question during election season. Section (3)(c) applies even to general-fund donors—many of whom support "the totality of [an] organization's activities," but may not endorse a specific advertisement. Aplt. Br. at 45. Yet the CRA subjects these donors to the same disclosure requirements as those who directly fund a specific advertisement. And because the CRA draws no distinctions, the electorate has no way to differentiate between general and specific donors.

This result does not comport with New Mexico's interest in informing the electorate. Consider a situation where an organization spends $5,000 on an advertisement during election season that merely describes, in simple terms, a ballot question. If a single donor contributed $4,500 with instructions to produce the Section (3)(c) advertisement, and twenty other donors each contributed $5,000 to the organization's general fund during election season, the CRA would require the organization to disclose for publication the names and addresses of all twenty-one donors, as well as the amounts of their contributions. A member of the electorate who wishes to identify the source of the message could not differentiate between the twenty-one names; by numbers alone, she would overestimate the influence of the

7

twenty donors and underestimate the influence of the single donor on the advertisement.[6]

This mismatch casts doubt on New Mexico's claim that the regime is narrowly tailored to serve the state's interest in informing the electorate. But perhaps more fatal to New Mexico's position is that there is a clear alternative means of furthering that interest. Rather than imposing the broad-sweeping disclosure requirement for advertisements under Section (3)(c), New Mexico could have outlined a special earmarking system for those advertisements in the CRA. As we explained in *Wyoming Gun Owners*, disclosure laws that are limited to "donors who have specifically earmarked their contributions" for advertisements "help[] render [a] statute's scope sufficiently tailored." 83 F.4th at 1248 (citation modified). This principle has intuitive appeal: An earmarking system "directly links speaker to content," ensuring that voters truly understand the source of election-related content. *Id.*

New Mexico does not explain why this alternative—which not only burdens less speech, but also "better serves the state's informational interest," *id.*—is beyond

---

[6] The CRA's structure may also result in forced association between general-fund donors and ad-specific donors. As explained, some general-fund donors may support "the totality of [an] organization's activities," Aplt. Br. at 45, but may not want their names and addresses published alongside a donor who has earmarked her funds for independent expenditures. *Cf. Chiu*, 85 F.4th at 523–24 (Van Dyke, J., dissenting from denial of rehearing en banc) ("The friends of your friend may want nothing to do with you—and vice versa."). This raises additional constitutional concerns. *See generally Cal. Democratic Party v. Jones*, 530 U.S. 567, 581–82 (2000) (noting the "heav[y] burden" that forced association imposes on associational freedom).

its reach.[7]  Although we do not categorically require legislatures to include an earmarking provision to survive narrow tailoring in the disclosure context, *see id.* at 1249 n.8, New Mexico's other efforts at tailoring the CRA fall short.

The opt-out provisions, for example, cannot save the disclosure requirement for Section (3)(c) advertisements.  Indeed, because some organizations do not use their funds for express advocacy or its functional equivalent (and instead endeavor only to inform the electorate by disseminating information about candidates and ballot questions), donors may not understand the need to opt out of advertisements they do not recognize as advocacy.[8]  *See generally Button*, 371 U.S. at 438 ("Precision of regulation must be the touchstone in an area so closely touching our most precious freedoms."); *Wyo. Gun Owners*, 83 F.4th at 1247 (concluding a Wyoming statute's disclosure regime was not narrowly tailored in part because it "burden[ed] an advocacy group with muddling through ambiguous statutory text that fails to offer guidance on compliance").  And though the monetary thresholds and timing requirements tighten the scope of the disclosure requirement for

---

[7] In fact, New Mexico already has a limited earmarking system in place.  The CRA requires disclosure where a donation exceeding $200 is "earmarked or made in response to a solicitation to fund independent expenditures."  N.M. Stat. Ann. § 1-19-27.3(C).  But New Mexico does not explain why it could not limit its other disclosure requirements to donors who have specifically earmarked their contributions.

[8] The unpredictability surrounding the breadth of Section (3)(c) raises significant constitutional concerns.  Indeed, as the majority explains, Section (3)(c) captures advertisements that present competing but reasonable interpretations and have a "more subtle political purpose."  Maj. Op. at 15.  This cloud of uncertainty— which covers a significant amount of speech—is not the "[p]recision of regulation" the First Amendment requires.  *Button*, 371 U.S. at 438.

advertisements under Section (3)(c), they do not "'demonstrate [New Mexico's] need' for the disclosure regime 'in light of [the] less intrusive alternative[]'" of an earmarking system. *Wyo. Gun Owners*, 83 F.4th at 1247 (quoting *Ams. for Prosperity Found.*, 594 U.S. at 614).

The lack of tailoring to New Mexico's informational interest "is categorical—present in every case," *Ams. for Prosperity Found.*, 594 U.S. at 615—as are the severe burdens Section (3)(c) places on associational freedom, *see Ward v. Thompson*, 2022 WL 14955000, at *3 (9th Cir. Oct. 22, 2022) (unpublished) (Ikuta, J., dissenting) ("As *Americans for Prosperity Foundation* made clear, *whenever* the government compels disclosure of members' identities, it burdens the First Amendment right of expressive association."). *See supra* pp. 1–3. Accordingly, I would hold that the disclosure requirement for Section (3)(c) advertisements is facially unconstitutional.

### III.

"The government may regulate in the First Amendment area only with narrow specificity, and compelled disclosure regimes are no exception." *Ams. for Prosperity Found.*, 594 U.S. at 610 (citation modified). The disclosure requirement for Section (3)(c) advertisements blatantly contradicts this directive: It does not comport with New Mexico's interest in informing the electorate; it unnecessarily burdens core political speech; and it disproportionately harms those who hold unpopular beliefs. The majority's contrary conclusion is irreconcilable with the Supreme Court's recent imposition of a narrow-tailoring requirement. I respectfully dissent.

10